[No. S045140. Dec. 21, 1995.]

BRUCE W. DODDS, a Judge of the Superior Court, Petitioner, v.
COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

COUNSEL

Lewis, D'Amato, Brisbois & Bisgaard, Robert F. Lewis, Gordon J. Calhoun, Douglas R. Reynolds and James E. Friedhofer for Petitioner.

Daniel E. Lungren, Attorney General, Marc E. Turchin and David F. Glassman, Deputy Attorneys General, for Respondent.

OPINION

THE COURT.—Judge Bruce W. Dodds of the Santa Barbara County Superior Court has petitioned for review of the recommendation of the Commission on Judicial Performance (Commission) that he be publicly censured for acts that the Commission found to constitute "wilful misconduct in office" and "conduct prejudicial to the administration of justice that

brings the judicial office into disrepute." (See Cal. Const., art. VI, § 18, subd. (d) [formerly subd. (c)];[1] Cal. Rules of Court, rule 919(b).)

The bases for the Commission's recommendation are 1) that petitioner obstructed a law enforcement investigation, 2) that petitioner "has frequently given the appearance of rudeness and prejudgment in his handling of cases," and 3) that petitioner made an offensive remark in chambers about two lawyers who had appeared before him. As set forth below, we agree with the Commission's findings of fact, but disagree with some of the Commission's conclusions of law. We reject the Commission's recommendation of public censure.

## I. SCOPE OF REVIEW

The Commission's notice of formal proceedings, dated January 27, 1994, and amended July 26, 1994, specified six counts and thirteen separate incidents of misconduct. ■ Our concern is only with the incidents that the Commission has sustained. (*Spruance v. Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 784, fn. 5 [119 Cal.Rptr. 841, 532 P.2d 1209] (*Spruance*).) With respect to those incidents, we review the record independently, cognizant that there must be "proof by clear and convincing evidence sufficient to sustain a charge to a reasonable certainty." (*Geiler v. Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1] (*Geiler*); *Doan v. Commission on Judicial Performance* (1995) 11 Cal.4th 294, 313 [45 Cal.Rptr.2d 254, 902 P.2d 272] (*Doan*); *Gonzalez v. Commission on Judicial Performance* (1983) 33 Cal.3d 359, 365 [188 Cal.Rptr. 880, 657 P.2d 372] (*Gonzalez*).) Nevertheless, we give "special weight" to factual determinations in the report of the masters, as the masters had the advantage of observing the demeanor of the various witnesses. (*Gubler v. Commission on Judicial Performance* (1984) 37 Cal.3d 27, 34 [207 Cal.Rptr. 171, 688 P.2d 551] (*Gubler*); *Wenger v. Commission on Judicial Performance* (1981) 29 Cal.3d 615, 623 [175 Cal.Rptr. 420, 630 P.2d 954] (*Wenger*).) In addition, in recognition of the Commission's expertise, we accord "great weight" to the Commission's conclusions of law. (*Kennick v. Commission on Judicial Performance* (1990) 50 Cal.3d 297, 314 [267 Cal.Rptr. 293, 787 P.2d 591, 87 A.L.R.4th 679] (*Kennick*); *Wenger, supra*, 29 Cal.3d at p. 623.) We are particularly deferential to the Commission when it has acted unanimously. (*Wenger, supra*, 29 Cal.3d at p. 623.)

---

[1]The voters approved Proposition 190 at the November 8, 1994, election, thereby substantially amending article VI, section 18 of the California Constitution. By its terms, Proposition 190 became operative on March 1, 1995. Because petitioner's conduct preceded March 1, 1995, we apply the version of the Constitution that existed prior thereto.

Finally, based on our findings of fact and conclusions of law, we determine what discipline, if any, is appropriate. (*Gubler, supra,* 37 Cal.3d at p. 34; *Geiler, supra,* 10 Cal.3d at p. 276.)

## II. FAIRNESS OF COMMISSION PROCEEDINGS

Before turning to the facts underlying the various charges and the merits of the Commission's conclusions of law, we address petitioner's threshold arguments. First, petitioner asserts that some members of the Commission were likely biased against him because of collateral litigation that he brought against the Commission in an effort to preserve the confidentiality of this proceeding. We rejected this same argument in *Adams* v. *Commission on Judicial Performance* (1995) 10 Cal.4th 866, 880-884 [42 Cal.Rptr.2d 606, 897 P.2d 544] (*Adams*), and we need not repeat our discussion here. In the course of adjudicative proceedings, decisionmakers frequently make preliminary or collateral determinations against a party. Absent persuasive evidence of actual bias, there is no reason to assume that these decisionmakers thereby lose their objectivity. (*Ibid.*; see also *Withrow* v. *Larkin* (1975) 421 U.S. 35, 56 [43 L.Ed.2d 712, 728-729, 95 S.Ct. 1456].)

■ Second, petitioner cites as error the refusal on the part of the masters and the Commission to consider the testimony or declarations of a number of witnesses who had favorable impressions of petitioner, though they had not observed any of the specific incidents that were the subject of the inquiry. The exclusion of this evidence was well within the discretion of the masters and the Commission. (Cal. Rules of Court, rule 909; Evid. Code, § 352.) The masters permitted many character witnesses to testify in petitioner's favor and reasonably determined that additional testimony of this kind would be cumulative.

In an effort to compensate for the exclusion of these witnesses, petitioner has submitted to this court 64 letters and declarations from members of the bar. These letters and declarations generally praise petitioner's skills as a judge, particularly noting his ability to settle difficult cases by getting to the heart of the dispute and speaking frankly with counsel and the parties. Nearly all of these declarants qualify their praise of petitioner, using such words as "tough," "short," "abrupt," "direct," "rude," "impatient," and "gruff." Though these terms are generally used in the context of describing petitioner's reaction when counsel is unprepared, many declarants opine that petitioner should exercise more self-restraint. Much of this evidence is cumulative or of little probative value. We decline to take it into consideration.

### III. FINDINGS OF FACT

We conclude that clear and convincing evidence supports the Commission's findings of fact. As in *Fitch* v. *Commission of Judicial Performance* (1995) 9 Cal.4th 552, 556 [37 Cal.Rptr.2d 581, 887 P.2d 937] (*Fitch*), "[b]ecause this case involves public censure rather than outright removal of a judge, we need not explore in detail the extensive factual matrix underlying each of the Commission's findings." The following summary adequately states our findings with respect to petitioner's misconduct.

#### A.  *Interference in a Law Enforcement Investigation*

On April 21, 1993, petitioner and some members of his staff, when returning from lunch, observed another superior court judge remove the air from the tire of a van that was parked in that judge's assigned parking space in the courthouse parking lot. Petitioner did not try to dissuade his colleague from deflating the van's tire. The van turned out to be registered to a disabled person. For four weeks, petitioner did nothing to bring the incident to the attention of appropriate authorities. Even after press reports indicated that the judge who had deflated the tire had denied responsibility, petitioner did not publicly disclose his knowledge about the incident. Petitioner did, however, discuss the matter with the presiding judge of the court as well as the court's research attorney. In those discussions, petitioner expressed concern that the responsible judge had apparently denied involvement. Petitioner also said that he intended to tell the truth if asked.

On May 19, 1993, a detective from the Santa Barbara County Sheriff's Department came to petitioner's courtroom while court was in session and spoke to the bailiff, who took a note to petitioner. Through the bailiff, petitioner told the detective that he did not want to make a statement regarding the incident. Later, during the noon recess, petitioner met the detective in chambers and repeated that he did not want to make a statement, explaining that he was "too close." Petitioner also suggested to his staff that they decline to make statements, at least until the detective had interviewed the responsible judge. Though petitioner told his staff that it would not affect their jobs if they chose to speak to the detective, most of petitioner's staff followed petitioner's suggestion and refused to do so.

Later the same day, the detective spoke with the Santa Barbara County District Attorney, explaining the situation. The district attorney telephoned petitioner and accused him of obstructing justice. Following this conversation, petitioner arranged to meet with the detective, as well as the judge who

had deflated the tire and the court's research attorney. Petitioner conferred with the latter two for a short time out of the detective's presence. Then petitioner invited the detective to join the group, and the judge who had deflated the tire gave a statement admitting his conduct. After this admission, petitioner also gave a statement to the detective. Petitioner's statement was only four and a half hours after the detective first approached petitioner.

On June 3, 1993, petitioner issued a press release that the court's research attorney had drafted. The press release briefly described the foregoing events.

## B.  *Appearance of Rudeness and Prejudgment*

During a settlement conference in a case involving alleged sexual misconduct by a physician, petitioner abruptly and repeatedly interrupted the plaintiff. Petitioner and the plaintiff then began to argue, and petitioner pressed the plaintiff for a settlement figure. Because of the inflammatory nature of the plaintiff's allegations, a key issue in the settlement was a confidentiality clause that the plaintiff opposed. The plaintiff was concerned that the confidentiality clause would prevent her from warning others about the physician's actions. Nevertheless, petitioner insisted that the case was about money and demanded a settlement figure. When the plaintiff finally provided a figure, petitioner angrily threw up his arms and yelled, "Get out, it will not settle." The plaintiff cried at the time, and cried again when asked to recount the incident as part of this proceeding.

In a second case, the plaintiff had sued a railroad, alleging that he had lost part of his foot when climbing across a stopped train that began to move. During proceedings immediately prior to trial, petitioner would not allow the plaintiff's counsel to explain his theory of liability, interrupting counsel in a hostile and angry manner, using a loud tone of voice, and disparaging counsel's arguments.

In a third case, after the parties reached a structured settlement, petitioner became angry when, for tax reasons, counsel declined to reveal the total value of the settlement. Petitioner required counsel for both sides to remain in the courtroom until late in the evening.

Finally, in a fourth case, petitioner reduced a chiropractor's lien and shortly thereafter made a joke that suggested that chiropractors provide excessive treatment. The joke was made outside the courtroom, but in front of the minor plaintiff's mother.

## C. *Offensive Remark*

The Commission found that in approximately 1987 petitioner made an offensive remark in chambers about two lawyers who had appeared before him. For reasons discussed below, we do not reach this issue.

## IV. CONCLUSIONS OF LAW

■ Under former subdivision (c) of article VI, section 18 of the California Constitution, we may censure a judge for "wilful misconduct in office . . . , or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." We have defined the phrase "wilful misconduct" as comprising three elements: 1) "unjudicial conduct," 2) "committed in bad faith," 3) "by a judge acting in his judicial capacity." (*Spruance*, *supra*, 13 Cal.3d at p. 795; *Doan*, *supra*, 11 Cal.4th at p. 311; *Geiler*, *supra*, 10 Cal.3d at p. 284.) Our decisions give further definition to each of these elements. First, in order to determine whether a judge's conduct is "unjudicial," we measure that conduct with reference to the California Code of Judicial Conduct. (*Doan*, *supra*, 11 Cal.4th at p. 312; *Adams*, *supra*, 10 Cal.4th at p. 878; *Spruance*, *supra*, 13 Cal.3d at p. 796; *Geiler*, *supra*, 10 Cal.3d at pp. 281-282.) Second, by "bad faith" we mean that the judge "intentionally committed acts which he knew or should have known were beyond his lawful power" (*Geiler*, *supra*, 10 Cal.3d at p. 286) or "acts within the lawful power of a judge which nevertheless [were] committed . . . for any purpose other than the faithful discharge of judicial duties" (*Spruance*, *supra*, 13 Cal.3d at p. 796; *Doan*, *supra*, 11 Cal.4th at p. 311). Third, a judge is "acting in his judicial capacity," when he is performing one of his "judicial functions," i.e., one of the varied functions generally associated with his position as a judge, whether adjudicative or administrative in nature. (*Adams*, *supra*, 10 Cal.4th at p. 910.) In determining whether a judge acted in his judicial capacity, we give due weight to the location of the judge's conduct. (*Kennick*, *supra*, 50 Cal.3d at p. 319.) Thus, when a judge is on the bench, he is presumptively acting in a judicial capacity. (See, e.g., *Gonzalez*, *supra*, 33 Cal.3d at p. 376.) Similarly, when a judge is in chambers during normal working hours, he is generally, though not necessarily, acting in a judicial capacity (See, e.g., *Geiler*, *supra*, 10 Cal.3d at pp. 277 and 284 [finding wilful misconduct based on conduct occurring in chambers].) In addition, if a judge uses, or attempts to use, his authority as a judge for improper ends, regardless of location, we consider the judge to be acting in his judicial capacity. (*Kennick*, *supra*, 50 Cal.3d at p. 319.)

■ Unjudicial conduct that does not rise to the level of wilful misconduct, either because of a lack of bad faith or because the judge was not

acting in a judicial capacity, may nevertheless constitute prejudicial conduct. (*Spruance, supra,* 13 Cal.3d at p. 796; *Geiler, supra,* 10 Cal.3d at p. 284.) Prejudicial conduct refers to conduct that "would appear to an objective observer to be not only unjudicial . . . but . . . prejudicial to public esteem for the judicial office." (*Geiler, supra,* 10 Cal.3d at p. 284.) The conduct, however, need not be notorious. It is enough that the conduct be known to those members of the public who observed it. (*Kennick, supra,* 50 Cal.3d at p. 314; *Wenger, supra,* 29 Cal.3d at p. 622, fn. 4.)

With these principles in mind, we consider the three categories of misconduct that formed the bases for the Commission's recommendation.

A. *Interference in a Law Enforcement Investigation*

The Commission found that, in light of petitioner's inaction after observing his colleague deflate a tire on a van, his subsequent interference in the investigation of the incident constituted wilful misconduct. We disagree.

We agree with the Commission that petitioner's interference in the investigation was unjudicial. Canon 2A of the California Code of Judicial Conduct, adopted October 5, 1992 (Deering's Cal. Ann. Codes, Rules (appen.) (1995 Pocket supp.) p. 388), provides that "[a] judge . . . should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 3D provides that "[a] judge should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware." Petitioner's conduct was manifestly inconsistent with both these standards.[2] Petitioner observed his colleague engage in patently improper conduct. During the next

---

[2]The formal charge against petitioner notes that petitioner's "actions were contrary to Canon 2A of the California Code of Judicial Conduct." Petitioner argues that we should not take canon 3D into consideration because it was not noted in the charge. Judicial discipline proceedings, however, consider whether a judge has engaged in unjudicial conduct, not whether the judge has violated any particular canon of the California Code of Judicial Conduct. We consider the standards of conduct enunciated in the California Code of Judicial Conduct only for guidance (see, e.g., *Doan, supra,* 11 Cal.4th at p. 312), and the reference to canon 2A in the charge in no way bars us from measuring petitioner's conduct against other standards. Indeed, a charge of judicial misconduct need not cite the Code of Judicial Conduct at all. We conclude that canon 3D is relevant to our inquiry.

In considering canon 3D, however, we do not conclude that it is in all cases unjudicial for a judge to remain silent about unprofessional conduct of which he is aware. Rather, it is necessary to look to the totality of the circumstances. For example, a judge who hears a rumor about a lawyer or a colleague does not have to become an investigator, rooting out details and reporting those details to the State Bar or the Commission. On the other hand, if a judge is a direct witness to manifestly unprofessional conduct that is either serious or repeated, the

four weeks, petitioner did nothing to bring the truth about the incident to the attention of appropriate authorities. Even after it appeared that his colleague had lied about the incident, petitioner did not come forward, saying only that he would reveal the truth if anybody asked him. Shortly thereafter, somebody did ask him—a detective from the Santa Barbara County Sheriff's Department—and petitioner refused to give a statement, also suggesting to his staff that they refuse to give statements at least until the responsible judge had had a chance to admit his conduct. When the district attorney accused petitioner of obstructing justice, petitioner agreed to give a statement, but only after hearing the statement of his accused colleague.

It is true that petitioner ultimately acted so as to encourage his colleague to admit to deflating the van's tire. Indeed, petitioner's actions may have produced a complete statement from his colleague sooner than if petitioner had not intervened. Nevertheless, it was for the detective, not petitioner, to decide how best to pursue the investigation. An investigator may prefer to interview witnesses to an incident prior to interviewing a suspect. Such interviews often enable the investigator to ask more pointed questions when later interviewing the suspect. In addition, an investigator may prefer to interview witnesses separately so that he can detect inconsistencies in their statements. Petitioner's conduct prevented the detective from pursuing either of these strategies. Interfering in this way with the detective's investigation violated the California Code of Judicial Conduct and constituted unjudicial conduct. (*Adams, supra,* 10 Cal.4th at p. 878.)

Petitioner's conduct also constituted bad faith. Petitioner intentionally interfered in the investigation, and he should have known that this interference was beyond his lawful power as a judge. (*Geiler, supra,* 10 Cal.3d at p. 286.) Moreover, petitioner's conduct was for a purpose other than the faithful discharge of his duties. (*Spruance, supra,* 13 Cal.3d at p. 796.) There is no credibility to petitioner's assertion that he was trying to protect the reputation of the judiciary by ensuring that his colleague would admit his error voluntarily. There was much that petitioner could have done, short of interfering in a criminal investigation, that would have encouraged his colleague to come forward. For four weeks, petitioner did nothing. The evidence establishes that petitioner was more concerned about protecting the reputation of his colleague than that of the judiciary.

---

judge should, unless circumstances dictate otherwise, report that conduct to appropriate authorities who can investigate further and take any necessary disciplinary action. In addition, even in situations where a judge has no affirmative duty to come forward and report the misconduct of a lawyer or a colleague, a judge should cooperate fully with an official investigation.

■ Citing *Spruance, supra,* 13 Cal.3d at page 796, petitioner argues that "actual malice" is a necessary element of bad faith, and that there is no evidence that petitioner acted maliciously. But in this context actual malice does not connote hate or ill will, but merely specific intent. (*Adams, supra,* 10 Cal.4th at p. 877; *Spruance, supra,* 13 Cal.3d at p. 796.) We conclude that petitioner's conduct satisfies the requirement of bad faith.

■ We find, however, that petitioner was not acting in a judicial capacity when he interfered in the investigation. First, petitioner was not performing one of the functions generally associated with his position as a judge. (Cf. *Doan, supra,* 11 Cal.4th at pp. 337-338; *Adams, supra,* 10 Cal.4th at p. 910; Gov. Code, § 68725.) Though one of those functions is to supervise staff, petitioner was not acting as a supervisor when he recommended to staff that they decline to give statements. Rather, petitioner was giving advice as a cowitness to an event that was unrelated to the work of the court. If petitioner had witnessed the incident with a friend instead of staff, no one would argue that giving advice to that friend was acting in a judicial capacity. To hold that petitioner acted in a judicial capacity simply because his advice carried with it a degree of authority due to his status as a judge and supervisor would mean that a judge is always acting in a judicial capacity when he talks to staff. We decline to interpret "judicial capacity" so broadly.

Second, though petitioner was at the courthouse when he met with the detective, that location was simply a convenient meeting place that the detective selected. The meeting had nothing to do with petitioner's work as a judge, but rather his status as a witness to an event that the detective was investigating. (Cf. *Kennick, supra,* 50 Cal.3d at p. 319.) Nor did petitioner's use of the bailiff cause petitioner to be acting in a judicial capacity. The detective approached petitioner while he was on the bench, and the detective chose to use the bailiff to communicate with petitioner. It would have been impolite for petitioner to ignore the detective, and it is hard to imagine how petitioner could have responded in a discreet way without using the bailiff. We are also unpersuaded that petitioner's use of the court's research attorney for advice and to prepare a press release caused petitioner to be acting in a judicial capacity. It is appropriate, indeed desirable, for a judge to consult with legal staff concerning what constitutes proper judicial conduct. In certain circumstances, this consultation may include advice as to the appropriate wording of a press release. If we were to hold that such a consultation caused a judge to be acting in a judicial capacity, thereby converting what might have been prejudicial conduct into wilful misconduct, we would discourage judges from seeking advice, which we decline to do.

Finally, petitioner did not attempt to curry favor with the detective, or anyone else, on account of his judicial status. (Cf. *Kennick, supra,* 50 Cal.3d at p. 319.)

Because petitioner was not acting in a judicial capacity, his interference in the investigation did not constitute wilful misconduct. Nevertheless, that interference, which was both unjudicial and prejudicial to public esteem for the judicial office, did constitute prejudicial conduct. (*Geiler, supra,* 10 Cal.3d at p. 284; *In re Chargin* (1970) 2 Cal.3d 617 [87 Cal.Rptr. 709, 471 P.2d 29] [newspaper coverage evidences prejudice to the public esteem for the judicial office].)

### B. *Appearance of Rudeness and Prejudgment*

■  The Commission found that petitioner's rudeness and prejudgment in the handling of cases, as exhibited on four occasions, constituted prejudicial conduct. We agree.

Canon 3B, subdivision (4) of the California Code of Judicial Conduct provides that "[a] judge should be patient, dignified, and courteous to all litigants, jurors, witnesses, lawyers, and others whom the judge deals with in an official capacity . . . ." Canon 3B, subdivision (5) provides that "[a] judge should not, in the performance of judicial duties, by words or conduct, manifest bias or prejudice . . . ." When measured against these standards (*Adams, supra,* 10 Cal.4th at p. 878), petitioner's conduct—which included interrupting and yelling loudly and angrily at counsel and a litigant, as well as telling a joke that suggested bias—was clearly unjudicial. It also brought disrepute upon the judicial office. (Cf. *Kloepfer* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 826, 841-844 [264 Cal.Rptr. 100, 782 P.2d 239, 89 A.L.R.4th 235]; *Furey* v. *Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1306-1307 [240 Cal.Rptr. 859, 743 P.2d 919] (*Furey*); *Spruance, supra,* 13 Cal.3d at pp. 789, 797; *In re Chargin, supra,* 2 Cal.3d 617.)

Petitioner argues that his "assertive" judicial "style" is desirable because it enables him to effect settlements in difficult cases. Petitioner's argument betrays an understanding of the judicial role that places too much emphasis on the efficient disposition of cases and too little emphasis on the dignity of litigants. The judicial system is not concerned only with the resolution of disputes. It also permits individuals and entities to participate in the process by which the state determines to exercise its power. Thus, due process

affords a litigant a right to be heard, "not only because he might contribute to accurate determinations, but also because a lack of personal participation causes alienation and a loss of that dignity and self-respect that society properly deems independently valuable." (Mashaw, *The Supreme Court's Due Process Calculus for Administrative Adjudication in Mathews* v. *Eldridge: Three Factors in Search of a Theory of Value* (1976) 44 U. Chi. L.Rev. 28, 49-50.) Even an otherwise just settlement, if imposed summarily and coercively, is likely to disserve justice by leaving the parties with a lingering resentment of one another and the judicial system. We laud the creative and diverse means by which judges assist parties in reaching voluntary settlements of complex disputes. But when a judge, clothed with the prestige and authority of his judicial office, repeatedly interrupts a litigant and yells angrily and without adequate provocation, the judge exceeds his proper role and casts disrepute on the judicial office.

### C.   Offensive Remark

The Commission found that petitioner made an offensive remark in 1987 that constituted prejudicial conduct. We do not reach this issue.

██    Under former subdivision (c) of article VI, section 18 of the California Constitution, "the Supreme Court may . . . censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term . . . ." Petitioner's current term began on January 1, 1995. Six years prior to the commencement of petitioner's current term was January 1, 1989. Petitioner allegedly made the offensive remark in approximately 1987. Accordingly, we are without power to impose a sanction based on the alleged remark.

Respondent points out that the Commission commenced disciplinary proceedings during petitioner's prior term, at which time we could have imposed discipline based on the alleged 1987 remark. Respondent argues that petitioner, who was put on notice of the charge in a timely fashion, should not be able to avoid discipline simply because he happened to commence a new term while the charges were being adjudicated. Though this argument has some appeal, we find the constitutional language to be unambiguous, and we see no way to read into that language the rule that respondent proposes. The constitutional provision is not a classic statute of limitations—it does not place a limit on when an action or proceeding may be *commenced.* Rather, it places a limit on the *total* time that may elapse from occurrence of an incident to imposition of discipline based on that incident. It thus

combines the functions of a statute of limitations and a rule limiting the time proceedings may remain pending. Respondent's interpretation would eliminate the latter function, allowing the Commission and this court an unlimited time to resolve disciplinary charges once they were filed. Moreover, the constitutional provision in question differs from a typical statute of limitations in that the limitations period varies depending upon how recently the judge began a new term. Thus, the relative difficulty of determining the truth about events that transpired many years in the past is not the only policy underlying the constitutional limitation. The provision also gives due deference to the will of the electorate in reelecting a judge to a new term. In sum, we are constitutionally precluded from imposing discipline based on the alleged 1987 remark.

## V. DISCIPLINE

It remains for us to determine what discipline is appropriate based on our findings of fact and conclusions of law. Petitioner has served as a judge of the Santa Barbara County Superior Court since January 1977 with praise from many members of the bar and with the approval of the electorate. Nevertheless, petitioner has engaged in prejudicial conduct, including interfering in a law enforcement investigation, rudeness and the appearance of bias.

Cases in which we have publicly censured judges involve conduct more serious than that involved here. (Cf. *Fitch, supra*, 9 Cal.4th at pp. 556-557 [judge told a court reporter, "Your butt looks good in that dress"; judge said to a court reporter, "I certainly hope you're not that frigid at home with your husband"; judge slapped or patted a court reporter and a court trainee on their buttocks]; *In re Rasmussen* (1987) 43 Cal.3d 536, 538 [236 Cal.Rptr. 152, 734 P.2d 988] [judge initiated probation revocation proceedings for personal reasons]; *In re McCullough* (1987) 43 Cal.3d 534, 535 [236 Cal.Rptr. 151, 734 P.2d 987] [delay in deciding case; erroneous salary affidavits]; *In re Creede* (1986) 42 Cal.3d 1098, 1099 [233 Cal.Rptr. 1, 729 P.2d 79] [same and repeated]; *Mardikian v. Commission on Judicial Performance* (1985) 40 Cal.3d 473, 478 [220 Cal.Rptr. 833, 709 P.2d 852] [same with mitigating circumstances]; *Gubler, supra*, 37 Cal.3d at p. 45 [judge used threats of criminal sanctions as a means of collecting attorney fees for the county]; *In re Youngblood* (1983) 33 Cal.3d 788 [191 Cal.Rptr. 171, 662 P.2d 108] [judge abused contempt power including incarcerating persons without cause]; *Roberts v. Commission on Judicial Performance* (1983) 33 Cal.3d 739, 745-746 [190 Cal.Rptr. 910, 661 P.2d 1064] [judge struck

officer in chest and shouted obscenities as officer tried to administer field sobriety test to judge's son; judge also tried to influence officers by identifying himself as a judge]; *In re Fisher* (1982) 31 Cal.3d 919, 920 [184 Cal.Rptr. 296, 647 P.2d 1075] [ex parte communication]; *In re Charles S. Stevens* (1982) 31 Cal.3d 403, 404-405 [183 Cal.Rptr. 48, 645 P.2d 99] [judge repeatedly used highly offensive racial and ethnic epithets to describe Blacks and persons with Spanish surnames]; *In re Robert S. Stevens* (1981) 28 Cal.3d 873 [172 Cal.Rptr. 676, 625 P.2d 219] [judge repeatedly telephoned former associates and discussed his sexual fantasies; recipients of these telephone calls repeatedly objected]; *In re Jensen* (1978) 24 Cal.3d 72, 73 [154 Cal.Rptr. 503, 593 P.2d 200] [repeated delay in deciding cases; erroneous salary affidavits]; *McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 532 [116 Cal.Rptr. 260, 526 P.2d 268] [judge repeatedly held benchside sentencing conferences with his bailiff, who would recommend the proposed sentence; judge also left the bench during court proceedings]; *In re Sanchez* (1973) 9 Cal.3d 844, 844-845 [109 Cal.Rptr. 78, 512 P.2d 302] [judge regularly gave bail bondsman prisoner release orders that were blank except for the judge's signature]; *In re Glickfeld* (1971) 3 Cal.3d 891 [92 Cal.Rptr. 278, 479 P.2d 638] [in chambers, judge called the victim of certain alleged crimes a "horse's ass"[3] and later made intemperate comments in open court]; and *In re Chargin, supra,* 2 Cal.3d at p. 617 [in the course of a juvenile court hearing, judge made inflammatory remarks reflecting upon the juvenile's family and members of the juvenile's ethnic group].) The record in this case is replete with evidence that petitioner is a talented judge who is often sought for his ability to settle difficult cases. Moreover, petitioner's interference in the investigation of his colleague, though improper, was not motivated by a desire to conceal the truth. "The purpose of these proceedings is not to punish errant judges but to protect the judicial system and those subject to the awesome power that judges wield." (*Furey, supra,* 43 Cal.3d at p. 1320; *Doan, supra,* 11 Cal.4th at p. 314.) We conclude that public censure in this case would not further this purpose. Accordingly, we reject the recommendation of the Commission.

**BAXTER, J.,** Concurring and Dissenting.—Like the majority, I agree with the findings of misconduct made by the Commission on Judicial Performance (Commission). I nonetheless believe this misconduct is not serious enough to warrant public censure. I therefore concur in rejecting the Commission's disciplinary recommendation.

Unlike the majority, however, I take the 1987 "offensive remark" incident into account when reaching my conclusion that no discipline by this court is

---

[3]The details of this case are described in Rothman, California Judicial Conduct Handbook (1990) page V-4.

warranted. In my view, the California Constitution, as applicable to this case, allows this court to impose discipline for any misconduct within six years before commencement of the "current term" the judge was serving *when the Commission set its formal hearing process in motion.* The Commission gave notice of formal proceedings against petitioner on January 27, 1994, and, sometime before August 17, 1994, the Commission requested the appointment of special masters to hear the case.[1] (See Cal. Rules of Court, rule 907.) At the latest of these times, petitioner was still serving a term which had commenced on January 1, 1989. Because the 1987 incident occurred less than six years before that date, the incident was a proper subject for our discipline. It makes no difference that petitioner has since been reelected and has started a new term.

In its pre-Proposition 190 form applicable to this case, the Constitution provided that "[o]n recommendation of the Commission . . . the Supreme Court may . . . censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term." (Cal. Const., art. VI, § 18, former subd. (c).)[2] The majority find this language "unambiguous" in providing that the "current term" is the one the judge happens to be serving when "the Supreme Court" finally acts on the Commission's recommendation. The result is that charges of serious misconduct, although properly made and proved before the Commission, and properly a basis for the discipline it proposes, may nonetheless suddenly drop away if the errant judge wins election to a new judicial "term" before we can act on the Commission's recommendation. I cannot agree that those who drafted and adopted the important provisions for judicial discipline "unambiguous-[ly]" intended such an unusual and anomalous result.

At the outset, I dispute the majority's assertion that the plain language of the constitutional provision compels their interpretation. The opposite is true. Article VI, section 18, former subdivision (c) of the California Constitution does not explicitly say whether the "6 years [before] current term" within which this court may remove or censure a judge is determined at the time we take final action or at some earlier stage of the disciplinary process. But when all the constitutional provisions for judicial discipline are read together, the flaw in the majority's construction is exposed.

---

[1]Hearings before the special masters began on August 17, 1994, and continued through September 2, 1994.

[2]As amended by Proposition 190, operative March 1, 1995, the Constitution transfers from this court to the Commission the powers of removal or censure and creates a new Commission power of "[public] admonish[ment]" short of censure. These Commission actions, like that of private admonishment, are now subject only to our review jurisdiction. As before, however, removal or censure may occur only for "action occurring not more than 6 years prior to the commencement of the judge's current term." (Cal. Const., art. VI, § 18, subd. (d).)

The Constitution gives this court no unilateral power to censure or remove a judge; we may act only upon a "recommendation" of the Commission. (Cal. Const., art. VI, § 18, former subd. (c).) The Commission's recommendation, in turn, depends entirely on its assessment of all the charges properly before it. This integrated disciplinary process, in which the Commission proposes and we merely dispose, cannot operate as contemplated by the literal constitutional language if charges which were timely when addressed by the Commission are no longer so by the time we act upon the Commission's findings and recommendations.

Indeed, even if there were literal support for the "plain language" construction the majority advance, we would thus be obliged to reject that construction under the well-settled rule that "[t]he literal language of [constitutional] enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].)

Moreover, periods of limitation, such as that provided by California Constitution, article VI, section 18, former subdivision (c), are typically measured from the formal commencement of proceedings, not from the later time when a final judgment or determination is rendered. We should not assume the framers and adopters of this constitutional provision "silently, or at best obscurely," decided an "important and controversial" public policy issue by adopting so radical a departure from prevailing legal principles. (*In re Christian S.* (1994) 7 Cal.4th 768, 782 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

The history of California Constitution, article VI, section 18, indicates that no such departure was intended. This court's power to censure or remove judges for misconduct, after a recommendation by the Commission, was added to the Constitution in 1960. (Cal. Const., art. VI, former §§ 1b, 10b, adopted at Gen. Elec. (Nov. 8, 1960) as Sen. Const. Amend. No. 14, Stats. 1959 (Reg. Sess.), res. ch. 254, pp. 5822-5825.) The original scheme empowered the Commission, "after such investigation as [it] deem[ed] necessary," to "order a hearing" on charges of misconduct, or to request this court to appoint special masters for that purpose. No time limit was placed on the misconduct which could be considered. (Cal. Const., art. VI, former § 10b.)

Subsequently, the Constitutional Revision Commission (CRC) undertook a comprehensive proposed modernization of the Constitution. An article VI committee was appointed to address judicial issues. The article VI committee's third working draft retained much of the form and substance of the

1960 provision for judicial discipline. However, a limitations period was included to the effect that "[t]he Commission on Judicial Qualifications [now the Commission on Judicial Performance] may order a hearing . . . or request the appointment of special masters . . . with respect to . . . cases [of misconduct] which occur in the term of office of the judge current *at the time of the hearing or request* or which occur in the term . . . of the judge immediately preceding *such* current term and the *Supreme Court* may make an order of removal . . . on the basis of any cause occurring during *such* terms of office." (Cal. Const. Revision Com., art. VI committee, third working draft (July 15, 1965) pp. 41-42, italics added.) The third working draft thus expressly stated that the period of limitations for exercise of *this court's* disciplinary power was to be measured backward from the time *the Commission* formally called for a hearing on the charges.

The third working draft was considered by the full CRC at its meeting of July 29, 1965. Judge Charles J. McGoldrick, speaking for the California Judges Association (CJA), commented upon the draft's provisions for judicial discipline. His only observation on the proposed limitations period was that "some [CJA] members feel . . . [the discipline provision] should be amended so that action could not be taken against a judge for his conduct prior to his current term of office or within four years of the date of the conduct charged against him." (Minutes, Cal. Const. Revision Com. meeting of July 29, 1965, p. 20.) The CRC referred the issue back to the article VI committee, which was to report directly to the drafting committee. (*Id.*, at p. 24.)

At its meeting of November 18, 1965, the CRC took up the drafting committee's final proposal, which tracked the current form of article VI, section 18, former subdivision (c), and included the current prohibition against censure or removal for conduct occurring more than six years before the judge's "current term." The final revised version was approved without discussion. (Minutes, Cal. Const. Revision Com. meeting of Nov. 18, 1965, pp. 12-13.)

The CRC's proposed constitutional revision was introduced in the Legislature as Assembly Constitutional Amendment No. 13 (1966 First Ex. Sess.) (A.C.A. No. 13). No changes were made to the limitations provision as A.C.A. No. 13 progressed through the two houses, and that provision (Stats.

1966 (First Ex. Sess.) res. ch. 139, par. Eighty-Second, p. 978) was adopted unaltered by the voters at the General Election of November 8, 1966.[3]

From this chronology of events the following principles emerge: the disciplinary limitations period proposed by the article VI committee clearly was to be measured by the term which the judge was "current[ly]" serving *at the time the Commission set the formal hearing process in motion.* That concept was never discussed or criticized, and no departure from it was ever suggested. While Judge McGoldrick proposed a shorter limitations period (current term or four years, whichever is less), he never intimated that the period should be measured from any later point in the disciplinary process, such as the imposition of final discipline by this court. Subsequent efforts by the article VI and drafting committees produced a briefer, semantically recast version of the discipline section. Most references to the Commission's detailed procedures were dropped, and the current limitations language was adopted. But there is no indication of an intent to alter the measurement of the limitations period as originally expressed in the third working draft.

It therefore seems quite clear that no such intent arose, and that the final language implicitly incorporates the original proposal in this respect. The modernization of the final language, with the consequent loss of procedural detail, simply eliminated the opportunity to include an express statement to that effect.

To overlook this clear history, and instead to adopt the majority's simplistic and unusual construction, has a distorting effect on the entire disciplinary process. An accused judge facing older but still timely charges has the incentive to delay the imposition of final discipline until after he commences a new term. By the same token, and with equally unjust implications, the Commission's examiner faces pressure to rush the matter to final discipline in order to avoid the intervening loss of valid and relevant charges.

The majority suggest the constitutional provision "combines the functions of a [classic] statute of limitations [measured by the time proceedings commence] and a rule limiting the time proceedings may remain pending."

---

[3]The ballot pamphlet materials for A.C.A. No. 13, submitted to the voters as Proposition 1-a, made no reference to the limitations period for judicial discipline. The argument in favor of the measure noted that a principal purpose of the constitutional revision effort was to reduce the length of the frequently amended Constitution of 1879, and to "put[] the Constitution into modern, concise, and easily understandable language." The argument also noted that judges would be under "stronger disciplinary procedures." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 8, 1966) p. 2.)

(Maj. opn., *ante*, at pp. 177-178.) By allowing commencement of a new term to shorten the total elapsed time between misconduct and final discipline, the majority assert, the constitutional provision "gives due deference to the will of the electorate in reelecting a judge . . . ." (*Id.* at p. 178.) But this "voters' will" analysis begs the fundamental question. There is no dispute that the Constitution immunizes a judge for certain past misconduct when the voters have more recently elected him to a new term. The issue is whether such immunity merely affects the charges the Commission may *hear*, or whether it may also prevent final discipline upon charges the Commission did properly hear. Contrary to the majority's conclusion, language, history, logic, and policy all indicate that the former construction is appropriate.[4]

As might therefore be expected, the majority's novel interpretation appears out of step with the rule in other jurisdictions. Of those few states that impose limitations on discipline for misconduct which precedes the judge's "current term," most appear to measure the limitations period backward from receipt of a complaint by the disciplinary agency. (See Rosenbaum, Practices and Procedures of State Judicial Conduct Organizations (1990) ch. 2, p. 17.)

Accordingly, I cannot endorse the majority's restrictive limitations period, under which petitioner may only be disciplined for judicial misconduct which took place within six years before the term he is serving at the moment we file this decision. Because the 1987 incident occurred within six years before the term petitioner was serving when the Commission's formal hearing process began, the Constitution does not prevent us from considering that incident.[5] Having done so, I nonetheless join the majority's

---

[4]One might argue that a judge is unlikely to "pull the wool over the voters' eyes" and win a new term when formal charges of misconduct are already pending against him. The facts of the instant case belie any such claim. Moreover, although Proposition 190 opens to the public all formal Commission proceedings begun after February 28, 1995 (Cal. Const., art. VI, § 18, subd. (j)), the Commission previously retained broad discretion to conduct a closed and confidential inquiry, even where charges of moral turpitude were involved. (*Id.*, former subds. (f), (g); see also Cal. Rules of Court, rules 902, 907.2; cf. *Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630, 638 [34 Cal.Rptr.2d 641, 882 P.2d 358].) Thus, there has been no guarantee that the voters would become aware of pending charges which might affect their support for the judge.

[5]As previously noted, Proposition 190, operative March 1, 1995, provides that *the Commission*, subject to our discretionary review, "may . . . censure . . . or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term . . . ." (Cal. Const., art. VI, § 18, subd. (d).) I assume the majority would conclude, by reasoning parallel to its analysis here, that this limitations period must be measured from the time the Commission takes its final disciplinary action, so that charges properly heard by the Commission might nonetheless be obliterated if the judge commenced a new term before the

determination that the discipline recommended by the Commission is not warranted.[6]

George, J., concurred.

Respondent's petition for a rehearing was denied February 15, 1996.

---

Commission's proceedings were final there. Thus, I cannot be confident that the mischief wrought by the majority's holding is ameliorated in future cases.

[6]By rejecting the Commission's recommendation of public censure, we leave the case at large for a determination by the Commission whether it should exercise its own power of private admonishment. (Cal. Const., art. VI, § 18, former subd. (c).) The Commission's constitutional power of private admonishment derives from a discrete, self-contained sentence which, unlike the provisions for censure and removal, specifies *no* time limitation on the conduct which may be considered. (*Ibid.*) It appears the Commission may therefore take the 1987 incident into account for admonishment purposes, and I do not read the majority's opinion as holding otherwise.