*CJP Supp. 101 Opinion
HANLON, Chairperson.
This disciplinary matter concerns Judge Nancy Brown, a judge of the Los Angeles County Superior Court.
PROCEDURAL HISTORY
Judge Brown was appointed a judge of the Los Angeles County Municipal Court in November 1976, and was elevated to the Los Angeles County Superior Court in December 1984. The events which are the subject of this matter took place between November 1991 and April 1998.
*CJP Supp. 102 Formal proceedings in this matter commenced with the filing on May 28, 1998, of a notice of formal proceedings. The notice of formal proceedings sets forth four counts. On June 15, 1998, Judge Brown filed a verified answer denying that her conduct violated the California Code of Judicial Ethics, or its predecessor, the California Code of Judicial Conduct.
As provided for by rule 121(b) of the Rules of the Commission on Judicial Performance, the Supreme Court appointed three special masters to conduct an evidentiary hearing and to prepare a written report. The evidentiary hearing was held in Los Angeles on February 22 and 23, 1999, before Justice Gilbert Nares, presiding, of the Court of Appeal, Fourth Appellate District, Judge James H. Chang of the Santa Clara County Superior Court, and Judge William L. Gordon of the Santa Barbara County Superior Court. The special masters filed their report to the commission on May 11, 1999.
Following the receipt of objections and briefs from Judge Brown and the office of trial counsel, the matter was orally argued before the commission on August 18, 1999. Mr. William Smith presented argument on behalf of trial counsel and Mr. Ephraim Margolin represented Judge Brown.
FINDINGS AND CONCLUSIONS
1. Count One (banning the criminal courts coordinator)
The masters found that beginning in late 1994, the length and number of criminal trials dramatically increased. As a result, each day there were between five and 30 “last day” felony cases that faced dismissal if trial did not begin. Increasingly, these cases had to be sent to civil departments, to the chagrin of the civil bar and with substantial security risks.
The presiding judge instructed the supervising judges of the criminal courts to remedy the problem. They decided to move Judge Brown from department 107 to department 126, which had a regular calendar and was on the 15th floor. They also decided to move Judge Ringer, another judge with substantial seniority, to a courthouse closer to his home due to failing health. The reasons for moving Judge Brown are somewhat ambiguous. The supervising judges recognized that the transfers of Judge Brown and Judge Ringer were “very sensitive matters,” as it was anticipated they would be unhappy with the reassignments.
In November 1994, the presiding judge told Judge Brown of the forthcoming move. On December 2, 1994, Judge Brown wrote to the presiding judge *CJP Supp. 103 objecting to the move. She characterized the forced move as “cruel, sadistic, humiliating and inexcusable” and lacking in any appreciation for her loyal service.
Mr. John Iverson, the criminal courts coordinator, worked under the direction of the supervising judge to ensure defendants received timely trials and to avoid dismissals due to delay. The supervising judge, who also maintained a calendar, had insufficient time to track the availability of courtrooms. Iverson was thus his “eyes and ears.” It was critical that Iverson had very accurate and up-to-the-minute information about the status of each courtroom. Iverson visited each courtroom every afternoon. If it appeared a case was nearing completion, he would speak to the judge and counsel in an effort to determine the day and the time the courtroom would be available.
On December 24, 1994, Iverson was visiting department 108, next to Judge Brown’s department. Judge Brown entered and appeared to be upset with Iverson’s presence. She loudly told him, “You shouldn’t be here. Stay away from here.” Iverson had previously had a good relationship with Judge Brown and was puzzled by her conduct. Judge Brown gave no explanation.
On January 6, 1995, respondent wrote to the supervising judge again objecting to the move. After expressing the negative impact the move would have on her and her concerns with the security on the 15th floor, Judge Brown wrote, without further explanation: “In the meantime, please advise John Iverson that I will not permit nor tolerate him in my courtroom; I will not permit or tolerate his presence in my chambers; I will not permit or tolerate his presence in my back hall; my clerk, bailiff, court reporter, and I will not speak to him on the telephone. If he comes within 25 yards of me or my courtroom or my chambers or the back hallway, he is likely to be a very unhappy boy. If my department is open, I will personally notify you and Margaret in the Coordinator’s office as I have always done.” Judge Brown moved to department 126 around the end of January 1995.
When Iverson was shown the letter, he could not understand it. Shortly after Judge Brown moved, Iverson tried to reach her by telephone to discuss the ban. Her clerk told him that Judge Brown would not speak to him and he was not to call. A few days later, Iverson went into the back hallway of department 126 to see Judge Brown. From her chambers she said, “You don’t belong here. Get away from here.” On February 3, 1995, Iverson encountered respondent at an elevator. She loudly shouted, “You’re not allowed here. Stay *CJP Supp. 104 away from me.” On some occasion, Iverson asked respondent why she imposed the ban, and she responded “Think about it.” Iverson, however, had no idea why respondent imposed the ban.
On February 6, 1995, Judge Brown sent the presiding judge a memorandum stating:
“When I returned from lunch last Friday, [February 3], I found John Iverson skulking around my chambers, my back hall, my elevator and my courtroom.
“Would you please communicate to John Iverson that I will not have him skulking around my chambers, my back hall, my courtroom talking with my staff or having anything to do with Department 126.
“I thought I had made that abundantly clear, but, apparently, John Iverson did not get the message.
“So I am asking you once again to communicate with him personally or Jim Bascue or whoever you want to communicate with, but John Iverson is not not not not not not to be in my back hallway, my chambers, my courtroom, nor is he to communicate with my staff by telephone.
“If I am open for trial, I will notify Margaret in the Coordinator’s Office as I have always done.”
Iverson told the supervising judges about his difficulties with Judge Brown. They were concerned and the assistant supervising judge attempted to speak to Judge Brown, but she responded that her clerk would call when they were available to take another case. She did not divulge the source of her displeasure with Iverson.
Iverson avoided department 126 and generally could not provide the supervising judge information on its availability. But for the ban, he would have visited the courtroom each day. The other departments cooperated fully with Iverson. On rare occasion, a deputy district attorney or a public defender would tell Iverson that Judge Brown’s courtroom was open, or the supervising judge would order him to contact department 126 for the status of a specific case. The masters found that sometime in 1998, Iverson’s office began receiving telephonic communications from department 126 that it was open.
*CJP Supp. 105 Judge Brown testified before the masters that despite the ban, she did everything she could to continue the smooth running of department 126. She indicated that although she initially instructed her clerk not to speak to Iverson, within a year she softened her position and instructed the clerk to alert the master calendar courtroom and the coordinator’s office each morning of their status.
There was conflicting evidence as to communications before 1998. Judge Brown’s clerks testified that she did not order them not to talk to Iverson or any members of his office and that they would respond to inquiries and inform department 100 when the court was open. Iverson testified that he had no idea what Judge Brown told her clerks, but that he would not have telephoned department 126 for information because of the ban and his office did not begin to get information from department 126 until 1998.
The masters resolved the conflicting evidence against Judge Brown. They noted that the supervising judge testified “that after he became supervising judge on January 1, 1997, he was required by respondent’s ban to telephone respondent’s courtroom 15 or 20 times to obtain information regarding the status of trials heard there and availability,” and that on other occasions, he asked deputy district attorneys assigned to his courtroom to check with the calendar deputy for department 126 to find out the status of the court. The masters observed that these measures would have been unnecessary if Iverson’s office was regularly receiving information from department 126.
The masters further noted that the information received from department 126 in 1998 was not particularly helpful because it was usually received after the day’s assignments had been made. They found that Judge Brown’s ban of Iverson made it difficult to “place last day cases in her court in a timely fashion rather than having to probably send them around the county or possibly the civil courthouse where they shouldn’t be.”
Before the masters, Judge Brown testified that her motivation for imposing the ban was anger at Iverson. She stated that on December 15, 1994, he had come to her chambers and said, “You’re moving to 126 tomorrow.” Later that day Judge Ringer had called her in tears and told her that Iverson had told him he had to move from his courtroom the next day. Judge Brown told Judge Ringer that she was not anxious to move and that he should take his time. Iverson denied telling Judge Ringer that he had to move immediately.
Judge Brown testified that she banned Iverson because she does not “permit rudeness or insensitivity” or the mistreatment of others. She thought *CJP Supp. 106 Iverson had treated Judge Ringer “abysmally, inexcusably, without any sensitivity, just cruelly.” She said to herself, “Nobody else is going to do anything else about it, so this is my protest, my quiet protest.” She wanted Iverson “to experience the same kind of pain he caused Judge Ringer.”
Judge Brown admitted she did not tell Iverson the reason for the ban until it had been in effect for three and a half years. She also admitted she never gave the supervising judges any explanation. Judge Brown conceded that she had no authority to ban Iverson from the public hallway or the courtroom, but maintained that the ban was an appropriate response to his treatment of Judge Ringer.
The masters concluded that in banning Iverson from her courtroom and prohibiting him from communicating with her staff, Judge Brown acted in her judicial capacity and violated California Code of Judicial Ethics, canon 3C(1), which requires a judge to cooperate with other judges and court personnel.
They noted that a centralized method of getting criminal cases to trial in a timely manner was crucial and that all the judges but Judge Brown cooperated. Judge Brown imposed an unnecessary administrative burden on the supervising judges.
The masters also found that Judge Brown acted in bad faith. She admitted that the ban was imposed solely to punish Iverson for his ostensible treatment of Judge Ringer, and that it was beyond her lawful power. The Supreme Court in Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1092 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman), held that bad faith includes conduct performed for any purpose other than the faithful discharge of judicial duties, or performed with knowledge the act is beyond lawful judicial power. The masters note that Judge Brown failed to tell the supervising judges why she imposed the ban, and only told Iverson after it had been in place for three and a half years. Judge Brown “never rectified the untenable situation she created,” and at the hearing, “remained convinced her conduct was appropriate even though unlawful.”
The masters concluded that as all the criteria are met, Judge Brown’s ban of Iverson constituted willful misconduct.[1] They note in mitigation the lack *CJP Supp. 107 of evidence that Judge Brown ever refused an assignment or that department 126 was ever without a trial or other business due to the ban.
The commission agrees with the masters that Judge Brown’s ban of Iverson constituted willful misconduct. In Broadman, the Supreme Court explained that “[t]o commit willful misconduct in office, a judge must (1) engage in conduct that is unjudicial and (2) committed in bad faith, (3) while acting in a judicial capacity.” (.Broadman, supra, 18 Cal.4th at p. 1091.) The court went on to state that a “judge acts in bad faith only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (18 Cal.4th at p. 1092.)
As the majority of the masters found, Judge Brown’s treatment of Iverson meets the Supreme Court’s definition of willful misconduct. Judge Brown’s memoranda to the supervising judges unequivocally ban Iverson from her courtroom, her chambers and the back hallway and prohibit him from communicating with her or her staff. Judge Brown admits that she had no authority to ban Iverson from the public hallway or the courtroom, that she did this as her “quiet protest” to punish Iverson, and that she did not tell any judge or Iverson the reason for the ban for three and a half years. Thus her conduct was unjudicial and committed while acting in a judicial capacity. She was clearly acting in bad faith, both because she had a corrupt purpose— punishing Iverson—which is not part of the faithful discharge of her judicial duties, and because she either knew or did not care that her actions exceeded her lawful powers. The latter conclusion is suggested by her insistence before the masters that despite exceeding her powers, the ban was an appropriate response to Iverson’s treatment of Judge Ringer.
The argument that Judge Brown was not advised of the administrative problems caused by the ban is problematic for several reasons. First, the record clearly shows that Judge Brown was aware that the ban was disruptive. She testified as to her understanding of Iverson’s responsibilities, the need to keep the master calendar courtroom informed, and her efforts to keep the supervising judge informed without talking to Iverson. The masters, however, found that despite her testimony to the contrary, she did not keep the coordinator’s office informed. Judge Brown also testified that although she refused to rescind the ban, she allowed her staff to talk to Iverson.
*CJP Supp. 108 Second, the record shows that the supervising judges made efforts to discuss the ban with Judge Brown but felt that her anger rendered such efforts futile. As Judge Brown never told them her real reason for banning Iverson, the supervising judges may have reasonably believed that Judge Brown remained angry with them over being moved, as implied in her written memoranda. Even four years after the ban, when Judge Brown spoke with the new presiding judge, she declined to lift the ban. There is little to suggest that Judge Brown would have changed her position if she had been more fully informed of the administrative problems occasioned by her ban.
Finally, the extent of Judge Brown’s knowledge of the actual administrative problems is more relevant to an evaluation of the harm caused by her misconduct, than the determination that the ban constitutes misconduct. The ban was in excess of her legal authority; it was issued in her judicial capacity and was in bad faith. Even if respondent had subsequently lifted the ban, the initial ban would still constitute willful misconduct. In addition to making it difficult to assign last-minute criminal cases to Judge Brown’s court, the ban “punished” Iverson, to the knowledge of the court personnel, without informing him, the judges, or other court staff of the reason for his punishment.
2. Count Two (ordering transportation of the Menendez brothers to courtroom for marriage and commenting on the vacation of transportation order)
The second count alleged that on June 11, 1996, Judge Brown issued an order for Lyle and Erik Menendez, who were awaiting sentencing on a conviction of murder, to be transported to her courtroom or chambers on July 1, 1996, in order that Judge Brown could perform a marriage ceremony for Lyle during lunch recess. The count states that shortly before July 1, 1996, Judge Brown learned that her transport order had been rescinded by the acting criminal courts supervising judge, but, nonetheless, she addressed matters involving the Menendez brothers on the record. The count alleged that Judge Brown improperly used her judicial power, improperly authorized the use of public resources, publicly commented on a pending case, and publicly disparaged a fellow judge, and that this conduct violated canons 1, 2A and 3B(9) of the California Code of Judicial Ethics.
The masters found that no evidence was introduced of the cost of transporting the Menendez brothers and that it was permissible and appropriate for judges to perform wedding ceremonies. They also found that on July 1, 1996, Judge Brown did not talk about the substance of the charges against the brothers, and that her comments were not intended and could not reasonably be perceived as commenting on the case. As to Judge Brown’s comments concerning the acting supervising judge, the masters found that *CJP Supp. 109 although Judge Brown was angry and her comments were inadvisable and gratuitous, nonetheless, “her brief remarks were not sufficiently caustic to undermine public confidence in the integrity and impartiality of the judiciary.”
For the commission to impose discipline there must be clear and convincing evidence of misconduct or improper action on the part of a judge. (Broadman, supra, 18 Cal.4th at p. 1090; Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 168 [48 Cal.Rptr.2d 106, 906 P.2d 1260].) The commission, having considered the record, the masters’ report, and the presentations by Judge Brown’s attorney and trial counsel, concludes that there is insufficient evidence to sustain the charge and hereby dismisses count two.
3. Count Three (the marijuana plant in the courtroom)
The third count alleged that from 1991 to the present, Judge Brown displayed an artificial marijuana plant in her courtroom and chambers while she conducted judicial business, including presiding over drug-related criminal cases. The count alleged that the display of the plant was inconsistent with her judicial obligation to maintain appropriate decorum and gave the appearance that she might not be fair and impartial in, or might not take seriously, matters that involved the subject of drugs. This conduct allegedly violated California Code of Judicial Ethics, canons 1 and 2A.
The masters noted that (a) the plastic marijuana plant was a gift from another judge, (b) the plant was only in the courtroom for a short while, (c) Judge Brown testified that she used the plant as a teaching tool, and (d) when a deputy district attorney requested that Judge Brown remove the plant before a narcotics trial began, it was removed from the courtroom. They conclude that while displaying the plant in the courtroom, or chambers, may have been ill-advised, there was no evidence that it impeded the administration of justice, and its display did not constitute willful misconduct or prejudicial misconduct.
Trial counsel raised no objections to the masters’ treatment of count three.
The commission, having considered the record and the masters’ report concludes that there is insufficient evidence to sustain the charge and hereby dismisses count three.
4. Count Four (smoking in chambers)
Count four alleged that from at least 1994, Judge Brown smoked tobacco products in chambers and allowed others to smoke in her chambers in *CJP Supp. 110 violation of the California Rules of Court and the Labor Code. It further alleged that when she received a letter from the commission, rather than give assurance that she would comply with the smoking laws, she implied that she would continue to smoke in her chambers, albeit with the door closed. This conduct was alleged to violate California Code of Judicial Ethics, canons 1 and 2A.
Judge Brown admitted before the masters that prior to April 1998, she, and others, smoked cigarettes in her chambers, and the masters found that smoking in chambers was unlawful and constituted improper conduct.
The commission notes that Judge Brown testified before the masters that she has stopped smoking and that she acknowledged that smoking in chambers is prohibited. These facts and Judge Brown’s lengthy service as a judge, prompt the commission, without in any way accepting any of the arguments offered to justify Judge Brown’s past practice, to decline to consider whether her actions constitute anything other than improper conduct.
DISCIPLINE
The Supreme Court noted in Dodds v. Commission on Judicial Performance, supra, 12 Cal.4th at page 179, that the purpose of judicial disciplinary proceedings “ ‘is not to punish errant judges but to protect the judicial system and those subject to the awesome power that judges wield.’ ”
The commission appreciates Judge Brown’s lengthy service as a judge and the fact that there is no evidence that Judge Brown ever refused an assignment or that her department was ever without a trial or other business due to the ban.
Nonetheless, the commission concludes that a public admonishment is appropriate for Judge Brown’s ban of the criminal courts coordinator from her courtroom. Judge Brown’s actions violated canon 3C(1) of the California Code of Judicial Ethics, which provides that a judge “shall cooperate with other judges and court officials in the administration of court business.” Judge Brown’s “quiet protest” interfered, as was foreseeable, with the administration of the court. Furthermore, by failing to tell either the coordinator or the supervising judges the reason for her action, Judge Brown in essence denied them any opportunity to appreciate her position, seek accommodations, or even to apologize. When a judge so wields her “awesome power,” the commission’s responsibilities to the public, the court staff and the judges constrain the commission to publicly identify such as willful misconduct.
*CJP Supp. 111 This decision shall constitute the order of public admonishment of Judge Brown.
Commission members Justice Hanlon, Ms. Bergthold, Mr. Farrell, Mr. Kahn, Mr. Kelly, Ms. Lui, Judge Pichon, Ms. Ripston and Ms. Sommars voted in favor of the disposition of each count and the imposition of discipline. Judge Flier recused herself from participating in this proceeding. Dr. Vinson did not participate in this proceeding.

 Judge Gordon filed a minority report finding that although Judge Brown violated California Code of Judicial Ethics, canon 3C(1), she was not directed to reconsider the ban and did not have knowledge of the actual impact of the ban and accordingly was only guilty of improper conduct.