*CJP Supp. 5 Opinion
CAPOZZI, Chairperson.
I.
INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge Edmund W. Clarke, Jr., a judge of the Los Angeles County Superior Court. The Commission on Judicial Performance (commission) commenced this inquiry with the filing of its notice of formal proceedings (Notice) on December 24, 2015. The Notice charged Judge Clarke with five counts of misconduct while he was presiding over jury selection on May 6, 2014, in a criminal trial involving four defendants charged with murder and gang allegations. The judge is charged with making discourteous and undignified comments to five prospective jurors,[1] and improperly ordering one of them to wait in the hall after she had been excused. The Notice further alleged that the charged conduct constituted a *CJP Supp. 6 pattern of discourteous, undignified, and inappropriate treatment of members of the public. Judge Clarke filed an answer to the Notice on January 13, 2016, in which he denied that his conduct as charged in the Notice constitutes grounds for discipline under the California Constitution.
The Supreme Court appointed three special masters, who held an eviden-tiary hearing and reported to the commission. The masters are the Hon. Carol D. Codrington, Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two; the Hon. Vincent J. O’Neill, Jr., Judge of the Ventura County Superior Court; and the Hon. Clay M. Smith, Judge of the Orange County Superior Court. A three-day public evidentiary hearing was held before the special masters commencing March 7, 2016, in Los Angeles, California. The masters’ report to the commission containing their findings of fact and conclusions of law was filed on May 9, 2016. On May 25, 2016, pursuant to Rules of the Commission on Judicial Performance, rule 131,[2] the Alliance of California Judges (Alliance) filed an amicus curiae brief in support of Judge Clarke.[3] Oral argument before the commission was heard on August 24, 2016.
The masters found that Judge Clarke engaged in improper action in his discourteous comments to the juror in count one, but found no impropriety in the judge’s conduct in ordering that juror to wait in the hall. The masters found no misconduct as to the remaining counts. We adopt the factual findings of the masters, with a few exceptions as discussed in this decision. For reasons we explain, we reach our own independent legal conclusions, and conclude that Judge Clarke’s treatment of jurors in counts one through four violated the California Code of Judicial Ethics (the canons) and constitutes misconduct within the meaning of article VI, section 18 of the California Constitution, as specified in this decision. We agree with the masters that the judge’s conduct as charged in count five did not violate the canons.
For many members of the public, jury duty is their only direct contact with the court system. When a judge engages in a pattern of discourteous and undignified treatment of jurors, public confidence in the integrity and impartiality of the judicial system is eroded.
*CJP Supp. 7 Judge Clarke’s mistreatment of four jurors in this matter, together with his prior discipline for misconduct that included making discourteous and undignified remarks to a propria persona defendant, convinces us that a public admonishment is the appropriate discipline.
Judge Clarke is represented by Edith R. Matthai, Esq., of Robie & Matthai, Los Angeles, California, and Kathleen M. Ewins, Esq., of Long and Levit LLP, San Francisco, California. The examiners for the commission are commission trial counsel Mark A. Lizarraga, Esq., and commission assistant trial counsel Sei Shimoguchi, Esq.
II.
APPLICABLE LEGAL PRINCIPLES
A. Burden of Proof and Standard of Deference to Findings and Conclusions of Special Masters
The examiner has the burden of proving the charges by clear and convincing evidence. (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman); Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 313 [45 Cal.Rptr.2d 254, 902 P.2d 272] (Doan).)
The commission gives special weight to the factual findings of the masters, who have the advantage of observing the demeanor of the witnesses; however, the commission may determine it is appropriate to disregard the factual findings of the masters based on the commission’s own independent review of the record. (See, e.g., Inquiry Concerning Stanford (2012) 53 Cal.4th CJP Supp. 1, 18; Inquiry Concerning Freedman (2007) 49 Cal.4th CJP Supp. 223, 232 (Freedman); see Broadman, supra, 18 Cal.4th at p. 1090; Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 168 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (Dodds).) Legal conclusions of the masters are entitled to less deference because the commission has expertise with respect to the law of judicial misconduct. (See, e.g., Broadman, supra, 18 Cal.4th at p. 1090; Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 880 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams); Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 878 [81 Cal.Rptr.2d 58, 968 P.2d 958].) As such, the commission reaches its own conclusions of law based on its independent review of the record and the law. (See, e.g., Freedman, supra, 49 Cal.4th CJP Supp. at p. 232; Inquiry Concerning McBrien (2010) 49 Cal.4th CJP Supp. 315, 321.) The Supreme Court has stated that it is “ ‘particularly deferential’ ” to the conclusions of *CJP Supp. 8 the commission when it has acted unanimously. (Broadman, supra, 18 Cal.4th at p. 1090; see Dodds, supra, 12 Cal.4th at p. 168.)
Judge Clarke and the Alliance assert that the commission should give dispositive effect to the factual findings and legal conclusions of the masters, except as to those factual findings to which Judge Clarke objects. The judge argues that to set aside the findings and conclusions of the special masters “would reduce the Formal Proceedings before the Special Masters to a fig leaf of due process used to disguise the power of the commission to impose its own views on the California judiciary.” The degree of deference urged by Judge Clarke and the Alliance is contrary to Supreme Court precedent and would require the commission to relinquish to the masters the commission’s constitutional mandate and authority to determine whether there is a basis for discipline, as well as the appropriate level of discipline. (Cal. Const., art. VI, § 18.)
Prior to the passage of Proposition 190 in 1994, which significantly changed the constitutional composition and procedures of the commission, the commission made recommendations to the Supreme Court on factual findings, legal conclusions and discipline following a hearing before special masters. (Cal. Const., art. VI, § 18, former subd. (c).) After reviewing the report and recommendation of the commission, the Supreme Court independently evaluated the evidence to determine if there was clear and convincing evidence to sustain the charges, and determined the appropriate level of discipline. Because the commission, not the masters, was vested with the constitutional power to make recommendations to the Supreme Court, the court held that the commission “is free to disregard the report of the masters and may prepare its own findings of fact and consequent conclusions of law.” (Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1] (Geiler).)
By the same reasoning, since the voters of California have entrusted the commission with the ultimate authority to make determinations of judicial misconduct and discipline, subject to discretionary Supreme Court review, the commission has a responsibility to independently review the record and make its own findings and conclusions, while giving special weight to the factual findings of the masters. This responsibility takes on added import in view of the voters’ decision to change the composition of the commission to a majority of public members. Moreover, with respect to conclusions of law, the commission must ensure that the law of judicial ethics is applied and interpreted consistently. The commission would be remiss in the exercise of its constitutional mandate in deferring to a legal conclusion that it determines to be incorrect.
*CJP Supp. 9 B. Levels of Judicial Misconduct
A violation of the California Code of Judicial Ethics constitutes one of three levels of judicial misconduct: willful misconduct, prejudicial misconduct, or improper action. (Cal. Const., art. VI, § 18, subd. (d).)
1. Willful Misconduct
Willful misconduct is (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091.)
Whether a judge’s conduct is unjudicial is measured with reference to the canons. (Dodds, supra, 12 Cal.4th at p. 172.)
A judge acts in bad faith “only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.)
It is not disputed that Judge Clarke was acting in his judicial capacity.
2. Prejudicial Misconduct
The second most serious level of misconduct is prejudicial misconduct, “conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” (Cal. Const., art. VI, § 18, subd. (d).) Prejudicial misconduct while acting in a judicial capacity does not require bad faith; rather, it is “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.” (Geiler, supra, 10 Cal.3d at p. 284.)
3. Improper Action
Improper action occurs when the judge’s conduct violates the canons, but the circumstances do not rise to the level of prejudicial misconduct and do not bring the judiciary into disrepute. (Inquiry Concerning Saucedo (2015) 62 Cal.4th CJP Supp. 1, 82; Inquiry Concerning Ross (2005) 49 Cal.4th CJP Supp. 79, 89 (Ross), citing Adams, supra, 10 Cal.4th at p. 899.)
*CJP Supp. 10 III.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
A. Factual Background
Judge Clarke presided over jury selection in People v. Diaz. Four defendants were charged with murder and gang allegations. The trial estimate was more than four weeks. Judge Clarke’s courtroom did not have the same resources available to the courts that are usually assigned long-cause felony cases with security concerns, so additional sheriffs deputies were assigned to his courtroom. Selecting jurors for the trial was made difficult by the estimated length of the trial and the number of peremptory challenges available to the multiple defendants and the district attorney.
A number of judges from the Los Angeles County Superior Court attested to the complexity of jury selection in a multidefendant case and the reluctance of many jurors to serve, particularly in long trials. These judges also discussed the challenges in evaluating claims of hardship and lack of English proficiency.
The charged conduct in this matter occurred on May 6, 2014, the second day of jury selection. Most of our factual findings are based on the transcript of that proceeding.
B. Count One
1. Factual Findings
Juror No. 7122 had written on her hardship form, “Having Severe Anxiety!!” next to a drawing of a distressed face. She added, “I work as a waitress and make minimum wages, plus I’m planning a wedding in two months and all of these things, especially this courthouse are aggravating my anxiety terribly. On the verge of a meltdown!” During the afternoon session, Judge Clarke discussed the hardship request with Juror No. 7122, and then stated, “I’m going to excuse you, and you can go. And good luck.” The juror then asked if she could add something and the following transpired:
“JUROR No. 7122: I would just like to add that, you know, everyone here in the jury has sacrificed a lot to even be here today. And, you know, anxiety is real. And the woman who is checking us in, I’m sure it’s a very stressful job. The way she’s treated everyone today has just been really disrespectful and—
“THE COURT: You can stay then and tell me about that at the end of the day.
*CJP Supp. 11 “JUROR No. 7122: I got to go.
“THE COURT: No, you’re staying. You’re staying. You’re staying on. I’ve been a judge for seven years. No one’s ever complained about my clerk. But I’ll be happy to hear your complaint at the end of the day. So go to the hall and stay and come in, act like an adult and you can face her and tell me everything she did wrong.
“JUROR No. 7122: Yes, sir.”
The next juror remarked, “Hate to follow that.” Judge Clarke responded, “Trust me, it would be hard not to look good after that.”
Juror No. 7122 went into the hallway, where she was seen crying. Approximately an hour later, near the end of the afternoon session, she was called back into the courtroom. The following occurred:
“THE COURT: All right. We now have back juror 7122. Why don’t you come right up to the front row there where I can hear you.
“JUROR No. 7122: Sure.
“THE COURT: Now, what did you want to tell me about the way you’ve been treated today?
“JUROR No. 7122: First of all, I apologize for upsetting you, or upsetting the clerk. That wasn’t my intentions. You know, we just take a lot of time out of our day to come here. And I know everyone is really stressed out here, and it’s a big job. But, you know, there was a comment made about my anxiety and it kind of, you know, really affected me. And, you know, I should have kept my mouth shut, obviously.
“THE COURT: Tell me what my clerk said that caused you to personally go after her like that.
“JUROR No. 7122: Well, like I said, I know—I know she has a hard job and everything, but the way that people are being talked to out there is just a little, you know—
“THE COURT: Such as what? Was there some language used that you thought was inappropriate ?
“JUROR No. 7122: No. I mean, just demanding people around kind of rudely. Like I said, I know there’s a lot of people coming in here. We don’t know *CJP Supp. 12 where—what we’re doing. That was—and then there was just like—I told her I was having anxiety, which is very real and very true. And then she made it—I don’t know if it was a joke about anxiety, ‘Well, I have anxiety too. You guys back up.’ And I felt that was personal to me. [¶] And I know—you know, I figured this is the place where we can have freedom of speech and exercise what is right, and that’s all I was trying to do. I really didn’t mean to offend or upset you in any way. I apologize for that.
“THE COURT: So because she didn’t respond to your claim of anxiety with appropriate sensitivity, you attacked her in open court in front of a judge with your criticism?
“JUROR No. 7122: I mean, I guess.
“THE COURT: I guess that’s exactly what you did. [¶] Now, you say you work as a waitress; right?
“JUROR No. 7122: Yes, sir. [¶] . . . [¶]
“THE COURT: So if I came into your establishment and criticized you loudly and in front of your manager, in front of other employees, and it wasn’t fair, how would you feel about that?
“JUROR No. 7122: I would be pretty upset. I would probably pull you aside and talk to you about it ?
“THE COURT: Privately. So she should have talked to you privately about your anxiety ?
“JUROR No. 7122: Yes.
“THE COURT: Where ?
“JUROR No. 7122: I don’t know, away from everyone.
“THE COURT: Where? Did you see how many hundred people [s/c] were in the hallway this afternoon?
“JUROR No. 7122: Yes, sir.
“THE COURT: The world does not circulate around any one of us. Not you and not me. When we no longer can see that other people are struggling and doing their best, we run the risk of looking immature and selfish and not contributing to the society that we’re supposed to support. And I see jurors *CJP Supp. 13 potentially who do that every day in every case. [¶] You’ve been in the jury room. You’ve heard people talking. You’ve heard them gossip. I hear their stories in every trial. Every trial there’s someone who tries to lie to me. There’s a lot of good people, but there’s plenty of liars. [¶] So if you came here thinking that this was going to be Disneyland and you were getting an E Ticket and have good time [s/c], I’m afraid you have no sense of what is going on in this building. [¶] Now, seven years ago the first clerk that was assigned to me, she’s still here. The only clerk I’ve ever had. One juror, in all that time, out of thousands, has ever complained about her. That’s you. [¶] You can leave now knowing that’s what you accomplished. Goodnight. We’ll be in recess for 15 minutes.”
Juror No. 7122 testified that when she asked the judge’s clerk for a hardship excuse based on anxiety, the clerk said, ‘“Oh, I’m having anxiety too. You guys get away from me. Just go stand over there.” Juror No. 7122 felt humiliated and insignificant. Based on the clerk’s tone and gestures, Juror No. 7122 thought the clerk was making a public joke of her anxiety.
The clerk handed out hardship request forms in the hallway outside the courtroom. When Juror No. 7122 asked to be excused because of her anxiety, the clerk told her to discuss it with the judge. The clerk did not perceive that the juror was actually suffering from anxiety. She denied making a joke about the juror’s anxiety or making rude gestures to her. The clerk had a personal space issue, which was causing her anxiety when people got too close to her. As some of the jurors started grabbing forms, she told them that she had anxiety and instructed them to step back.
Judge Clarke testified that Juror No. 7122 did not appear to be suffering from anxiety. In cross-examining Juror No. 7122, the judge elicited that she was a public speaker, actress, writer, and activist with a public Facebook page and a number of blogs, and that she posted on YouTube.
Multiple witnesses testified that the judge appeared upset by the juror’s statement about his clerk (he was ‘“really teeing off on her,” “he was angry,” he seemed like he took “personal offense,” he spoke in an “elevated tone”). Judge Clarke acknowledged that he was angry at the juror and that she had gotten “under [his] skin.” He admitted he was “defensive” and personally “hurt” and felt as if the juror had attacked a “person in [his] family.”
Juror No. 7122 testified that when she was recalled to the courtroom, she did not feel she could truly express her concerns about the judge’s clerk and felt she had been recalled to be reprimanded, not heard.
Judge Clarke acknowledged that he told the juror, “I’m going to excuse you, and you can go,” but denied that he actually excused her or that he lost *CJP Supp. 14 jurisdiction over her. Instead, he asserted that he was predicting that he would excuse her later or that she was not really excused because she was required to return to the jury assembly room to see if she was needed in another case. The judge also testified that a juror is not technically excused unless he specifically informs the juror that he or she must report back to the jury assembly room, which he did not say to Juror No. 7122. However, he acknowledged excusing other jurors without this specific instruction. In both his response to the preliminary investigation letter and his prehearing brief, the judge admitted that he had excused Juror No. 7122 before he ordered her to wait in the hall.
The special masters found that Judge Clarke had excused Juror No. 7122, but then reversed excusing her after she complained about his clerk. The examiner contends this finding is not supported by the record. Whether the judge excused the juror or reversed excusing the juror is not necessary to our determination of misconduct, for reasons discussed later in our conclusions of law. Thus, we do not make a factual finding on this issue.
At the evidentiary hearing, Judge Clarke contended for the first time that he relied on a discussion in Judge Rothman’s California Judicial Conduct Handbook in concluding that he had a duty and authority as a judicial officer to investigate the juror’s complaint against his clerk. In response to this explanation, the masters stated: “Although Clarke maintains he had an ‘ethical obligation’ to investigate Juror No. 7122’s complaint, the record demonstrates that Clarke did not truly consider the merits of her concerns. Instead, he immediately interrupted her and ordered her to wait outside without much explanation. When he finally called her back in at the afternoon’s end, he was dismissive of her claims of anxiety. He lectured her and made condescending comments about acting like an adult and not treating the court like Disneyland. [Fn. omitted.] [¶] Clarke did not consider that his clerk, . . . , might have overreacted when faced with trying circumstances. He did not ask [his clerk] if possibly she had been stressed and overreacted because of the large pool of jurors clamoring for her attention and crowding her physically. Instead, Clarke admits he spoke rudely to Juror No. 7122, retaliating against her criticism in defense of his clerk.”
Despite his position that the commission should defer to the factual findings of the masters, Judge Clarke asks the commission to reject this factual finding. He asserts that he inquired into the juror’s concern about his clerk when he asked her, “Now, what did you want to tell me about the way you’ve been treated today? [¶] - - - [¶] - - - Was there some language used that you thought was inappropriate?”
We agree with the masters that the record demonstrates by clear and convincing evidence that the judge was not truly concerned with investigating *CJP Supp. 15 the juror’s complaint about his clerk, but responded to her out of anger and in retaliation for her criticism of his clerk. After Juror No. 7122 complained about the clerk, the judge said, “No one’s ever complained about my clerk. ... So go to the hall and stay and come in, act like an adult and you can face her and tell me everything she did wrong.” When the juror said she had to leave, he repeated three times “you’re staying.” Judge Clarke acknowledged he was angry at her for “what she had done to [his] clerk.” He described feeling as if he or his family had been personally attacked. And, when the juror told the judge what his clerk had done, he responded by reprimanding her: “So because she didn’t respond to your claim of anxiety with appropriate sensitivity, you attacked her in open court in front of a judge with your criticism?” Moreover, as noted by the masters, the judge did not ask his clerk if the juror’s concerns had any merit, something a person truly interested in investigating the complaint would do.
2. Conclusions of Law
a. Comments to Juror No. 7122
We conclude, as did the masters, that Judge Clarke’s disparaging and discourteous treatment of Juror No. 7122 violated canon 3B(4), requiring a judge to be patient, dignified and courteous to jurors and others who appear before the court. The judge was dismissive of the juror’s claim of anxiety, lectured her and made condescending comments about acting like an adult and not treating the court like Disneyland. We independently conclude that this conduct also violated canons 1 (a judge shall uphold the integrity of the judiciary), 2 (a judge shall avoid impropriety and the appearance of impropriety), and 2A (a judge shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), and constitutes prejudicial misconduct.
Prejudicial misconduct is conduct that would appear to an objective observer to be not only unjudicial but prejudicial to public esteem for the judicial office. (Broadman, supra, 18 Cal.4th at pp. 1092-1093.) The masters concluded that the judge’s treatment of Juror No. 7122 did not create an appearance of impropriety or adversely affect the judiciary’s reputation. We reach a different conclusion.
The examiner contends that the masters did not properly apply the objective observer standard in determining whether the judge engaged in prejudicial misconduct, noting that the masters relied on the mixed reaction of actual observers in the courtroom, including the attorneys and court personnel. In Doan, supra, 11 Cal.4th 294, the Supreme Court stated, “We are concerned with an ‘objective observer’ and not with the ‘actual observers.’ ... To be sure, it is sufficient that the ‘actual observers’ view the *CJP Supp. 16 conduct in question to be such. [Citation.] But, contrary to [the judge’s] assertion, it is not necessary.” (Id. at pp. 324-325, original italics.)
The objective observer standard is similar to the reasonable person judicial disqualification standard (a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial). (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).) In defining the reasonable person standard for purposes of disqualification, the Supreme Court states, “ ‘The “reasonable person” is not someone who is “hypersensitive or unduly suspicious,” but rather is a “well-informed, thoughtful observer.” ’ [Citation.] ‘[T]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the disinterested objective observer whose doubts concerning the judge’s impartiality provide the governing standard.’ ” (Haworth v. Superior Court (2010) 50 Cal.4th 372, 389 [112 Cal.Rptr.3d 853, 235 P.3d 152], original italics, quoting United Farm Workers of America v. Superior Court (1985) 170 Cal.App.3d 97, 106, fn. 6 [216 Cal.Rptr. 4]; see also Wechsler v. Superior Court (2014) 224 Cal.App.4th 384, 391 [168 Cal.Rptr.3d 605]; Leland Stanford Junior University v. Superior Court (1985) 173 Cal.App.3d 403, 408 [219 Cal.Rptr. 40] [employing the “ ‘ “average person on the street”’” standard]; United Farm Workers of America v. Superior Court, supra, 170 Cal.App.3d 97, 104, 106, fn. 6 [applying average person on the street standard; also “the partisan litigant emotionally involved in the controversy ... is not the disinterested objective observer”].)
These cases suggest that the view of a disinterested actual observer may be a fact to consider, but is not determinative on the question of whether the conduct is prejudicial to public esteem for the judicial office. Determining the view of the objective observer encompasses a general assessment of how the conduct would be viewed by members of the public, or the average person on the street, aware of the facts and circumstances.
As the commission stated in Inquiry Concerning Van Voorhis (2003) 48 Cal.4th CJP Supp. 257, 312-313 (Van Voorhis): “The public looks to judges to set the tone of judicial proceedings. When a judge mistreats staff, belittles counsel or gives vent to his or her anger or frustration, the audience is not only concerned about the result in the specific matter before the court, but worries that other parties, lawyers, jurors and employees will be subjected to similar mistreatment.” We conclude that a judge’s disparaging and retaliatory treatment of a juror who was simply voicing a complaint about how a clerk was treating jurors would be considered prejudicial to public esteem for the judiciary in the eyes of an objective member of the public.
*CJP Supp. 17 b. Ordering Juror No. 7122 To Went in the Hall
Judge Clarke engaged in additional misconduct by ordering Juror No. 7122 to wait in the hall, where she waited for approximately an hour before being recalled and reprimanded for criticizing his clerk. The masters found no impropriety in this aspect of the judge’s treatment of Juror No. 7122. We disagree and conclude that the judge engaged in willful misconduct.
As previously discussed, there is clear and convincing evidence to support the conclusion that Judge Clarke ordered Juror No. 7122 to wait in the hall out of anger and in retaliation for her having criticized his clerk, not to make a genuine inquiry into the validity of her complaint. We conclude that this conduct violated canons 1, 2, 2A, 3B(4) and (5) (a judge shall perform judicial duties without bias or prejudice) and thus constitutes an unjudicial act by a judge acting in his judicial capacity. Judge Clarke also acted in bad faith, a requisite element of willful misconduct, because he acted for a corrupt purpose, a purpose other than the faithful discharge of judicial duties. (Broadman, supra, 18 Cal.4th at p. 1092.)
When a judge acts out of anger and for a retaliatory purpose, the judge is not acting in the faithful discharge of judicial duties. In Van Voorhis, supra, 48 Cal.4th CJP Supp. at page 275, the commission concluded that the judge’s comments, made in the presence of the jury suggesting that a prosecutor was misleading the jury, were made in bad faith and constituted willful misconduct because the judge was acting out of anger rather than in the faithful discharge of judicial duty. The commission rejected the judge’s assertion that the comments were made to ensure that the defendant received a fair trial, and instead concluded that the comments were made for the corrupt purpose of venting his anger or frustration. (See also Inquiry Concerning Velasquez (2007) 49 Cal.4th CJP Supp. 175, 193-195 [judge engaged in willful misconduct when he became embroiled and “ ‘acted out of pique, irritation or impatience, any of which is a purpose other than the faithful discharge of his judicial duties’ ”]; Ross, supra, 49 Cal.4th CJP Supp. at p. 100 [judge engaged in willful misconduct by adding new criminal charges against a defendant out of pique].)
The examiner contends that Judge Clarke also acted in bad faith by exceeding his authority in ordering Juror No. 7122 to wait in the hall after she had been excused. Judge Clarke maintains that he had authority to order the juror to wait in the hallway. We need not resolve this dispute because even if the judge had such authority, he exercised it for the improper purpose of venting his anger and in retaliation against the juror’s criticism of his clerk. As such, he acted for a purpose other than the faithful discharge of judicial duties and in bad faith.
*CJP Supp. 18 The masters concluded that although the judge engaged in “retaliatory conduct,” it was not improper because he was personally defending his clerk. The Alliance asserts that Judge Clarke had a duty to come to the defense of his clerk when her “competence” was challenged. We disagree.
Juror No. 7122 was voicing a complaint about what she perceived to be discourteous treatment of jurors by the judge’s clerk. This is something a member of the public has a right to do. There is no requirement that a judge come to the defense of a member of the judge’s staff under the circumstances presented here. To the contrary, canon 3B(4) provides that a judge shall require court staff and personnel under the judge’s direction to be patient, dignified, and courteous. (See Rothman, Cal. Judicial Conduct Handbook (3d ed. 2007) § 6.26, p. 276.)
Judge Clarke asserts that a judge must be able to provide for the orderly conduct of court proceedings and be in charge of time management. He maintains that he was avoiding delay in addressing other hardship requests by ordering Juror No. 7122 to wait in the hall rather than immediately addressing her complaint. We do not question a judge’s authority to manage the order of court proceedings, so long as it is done for a proper purpose. As noted, here, Judge Clarke acted for a retaliatory purpose.
The Alliance contends that the judge’s actions were in keeping with the spirit of canon 3C(1). That canon requires a judge to diligently discharge administrative duties impartially and prohibits a judge from engaging in speech that could reasonably be perceived as bias in the performance of those duties.[4] Judge Rothman states that a judge, “together with court administrators and the court’s judicial managers, share responsibility for staff, with the judge having the most direct control in the courtroom environment.” (Rothman, Cal. Judicial Conduct Handbook, supra, § 6.27, p. 278.) However, he warns that the “managerial role requires oversight and actions by the judge that can become more difficult when the judge’s relationship to staff is too personal. ... [¶] ... A professional relationship means that the judge understands that the first obligation is to the court and the public to maintain high standards in the management of the courtroom and the manner in which the important staff duties are performed.” (Ibid.)
Thus, even if inquiring into the juror’s complaint was within Judge Clarke’s managerial duties, the responsibility entailed determining whether there was merit to the complaint, not jumping to the conclusion that the complaint was meritless and immediately reprimanding the complainant in *CJP Supp. 19 open court. Moreover, a judge must be respectful and courteous in the performance of managerial responsibilities, and not act out of bias. Here, the judge allowed his personal bias toward his clerk to interfere with his objectivity.
C. Count Two
1. Factual Findings
On the morning of May 6, Judge Clarke questioned Juror No. 4688, who had asserted on her hardship request that she could not speak or understand English. The following occurred:
“[THE COURT:] Good morning.
“[JUROR NO. 4688]: Buenos dias. Good morning.
“[THE COURT]: Good morning.
“[JUROR NO. 4688]: Good morning.
“[THE COURT]: All right. So you answered in English and then you got down to the reason and—I know enough Spanish to know what you wrote here. You said T don’t speak and I don’t understand English.’
“[JUROR NO. 4688]: Correct.
“[THE COURT]: Correct. Thank you. How long have you been in this country?
“[JUROR NO. 4688]: [Twenty-five],
“[THE COURT]: [Twenty-five] years, yes. And you studied for citizenship in English, yes?
“[JUROR NO. 4688]: [Answers in Spanish.]
“[THE COURT]: Don’t try and fool me now, ma’am, you’ll be here a lot longer. Most people that have been in this country for ten years have picked up enough English. [Twenty] or so, they’re moving right along. And 25 years is—so you better have a different reason why you want to be excused than that. Otherwise you’ll be around here a while. [¶0 Do you want to come back tomorrow and talk to me about this more?
*CJP Supp. 20 “[JUROR NO. 4688]: [No audible response.]
“[THE COURT]: We’ll get your jury form to see what you wrote on ‘Do you understand basic English,’ and if you wrote ‘Yes.’ [¶] You can stay in the hallway please, we’ll get back to you. Stay in the hallway. [¶] Can you get her juror form? 4688.”
Later, near the end of the afternoon court session, Judge Clarke recalled Juror No. 4688, and the following transpired:
“THE COURT: Good afternoon.
“JUROR No. 4688: Good afternoon.
“THE COURT: Remind me of your number?
“JUROR No. 4688: Six eight—no. 4688.
“THE COURT: 4688. Okay. So I found your form and someone put ‘Yes’ for understanding English.
“JUROR No. 4688: No.
“THE COURT: And then they switched it.
“JUROR No. 4688: No, I understand no English. I’m sorry.
“THE COURT: Yes. I’m telling you I have it right here that you signed it and it says yes, and then someone moved it over to another side and put N-S on it. So here’s—if you understand me, I’m giving you a hint. If you start being honest with me you’ll go home. If I think you’re still trying to fool me, you might be back here tomorrow while I investigate this further. Because the jury form says that someone already evaluated you for English and you said to them that you didn’t speak English, and they already checked you. So they put a mark next to your number. [¶] So I don’t care if you don’t want to be here, but I do care if you’re trying to fool me and you think that that’s fair. So did you want to tell me how this all happened, or do you want to just come back tomorrow, I’ll get a Spanish interpreter here and have that person help me communicate with you.
“JUROR No. 4688: I’m sorry, I—I don’t understand nothing. No [en]tiendo.
“THE COURT: We can get an interpreter here this afternoon. You can wait in the hallway, we will get an interpreter here. [¶] As soon as we deal with this juror [Juror No. 7122] we’ll take a break and I’ll figure out what we do with our time, if any.”
*CJP Supp. 21 When Judge Clarke recalled Juror No. 4688 at approximately 4:00 p.m., a Spanish language interpreter was present. The following occurred:
“THE COURT: Is the interpreter here? Did you want to try and talk to this lady? Maybe we can get her on her way. [¶] Good afternoon, ma’am.
“JUROR No. 4688: Good afternoon.
“THE COURT: So now we have a certified Spanish language interpreter assisting you. Tell me—
“JUROR No. 4688: Thank you so much.
“THE COURT: When you just cried, why did you cry ?
“JUROR No. 4688: I felt ashamed.
“THE COURT: Why ma’am?
“JUROR No. 4688: Because I am a citizen and I really do need to speak English and I don’t know how to speak English.
“THE COURT: I’m sorry if you feel embarrassed about that.
“JUROR No. 4688: I feel that way too.
“THE COURT: So I assume you studied long ago to take the test; right?
“JUROR No. 4688: No. My father was German, may he rest in peace. And he had me naturalized as a citizen when I was two years old. And then he sent me to Mexico. And when I came back here I was already a grownup.
“THE COURT: All right. So as a citizen, some day we would like to have you serve as a juror. Now, I am not fluent in any other language, so I won’t criticize someone who only knows one language. For citizenship here you should make an effort. People would like to have someone with your background, someone with your knowledge, someone with your understanding hearing their case. So if you have time to work on your English, the next time you come in maybe you can stay to serve.
“JUROR No. 4688: Well, I would have to—I’ve got two jobs. I would have [to] quit one of my jobs.
*CJP Supp. 22 “THE COURT: I’m not ordering you to do anything. I’m hoping you have the time to do it.
“JUROR No. 4688: Okay. I’ll try. Of course I will.
“THE COURT: Many people come and they say they don’t understand English, and they actually can. And this has caused me to mistrust you, and now I feel that I should have trusted you more.
“JUROR No. 4688: Well, I want to thank you. I would not lie to you if I really could understand and if I really knew.
“THE COURT: All right. So now you’re free to go. You don’t have to go study anything, but I think everybody here would like to see you participating, if you can find the time and if you can.
“JUROR No. 4688: Of course. Thank you.
“THE COURT: Good luck. Thank you.
“JUROR No. 4688: Thank you so much. Thank you.”
The jury services division of the Los Angeles County Superior Court interviews prospective jurors to assess their English proficiency. When Judge Clarke first addressed Juror No. 4688, he had a list indicating that she had been prescreened and found to be English qualified.
At some point while Juror No. 4688 was waiting in the hall, Judge Clarke received her jury affidavit form from jury services. The form inquires whether the affiant is able to read and understand basic English, and includes circles indicating “yes” and “no.” Juror No. 4688 filled in both circles, but also crossed out and initialed the “no” box.[5]
The judge testified that the inconsistencies on the form, the prescreening information, and the juror’s responses made him skeptical of her claim that she did not speak English. One of the defense attorneys who spoke fluent Spanish thought the juror was not being honest about her lack of English skills because he saw her speaking English with other jurors in the hallway *CJP Supp. 23 and she had filled out the juror form in English.[6] However, there is no evidence that the attorney conveyed this information to Judge Clarke before the judge questioned Juror No. 4688 in the morning or afternoon.
Judge Clarke testified that he eventually excused Juror No. 4688 because she had been weeping loudly and openly.
2. Conclusions of Law
The masters concluded that although Judge Clarke may not have acted with absolute patience, dignity and courtesy, he did not violate the canons charged or engage in misconduct with respect to count two. Based on the factual findings of the masters and our independent review of the record, we determine that Judge Clarke violated canon 3B(4) through his discourteous and intimidating comments to Juror No. 4688.[7] We further conclude that the conduct constitutes improper action.
Judge Clarke contends that we should adopt the conclusion of the masters that he did not engage in misconduct because he had good reason to question the juror’s claim that she was not proficient in English, because the issue of juror English proficiency is a significant and ongoing problem in the Los Angeles County Superior Court, and because of the importance of having a jury reflecting a cross-section of the community. We do not question that the judge initially had reason to doubt the juror’s language claim or that language hardship claims are frequent and difficult to evaluate. However, this does not justify the judge’s harsh and disparaging comments to the juror in open court. He could have simply asked Juror No. 4688 to explain why she did not speak English after having been in the country for 25 years. If she claimed not to understand his questions, he could have told her to wait until he got the jury form and an interpreter, without accusing her of dishonesty in open court. In fact, once an interpreter arrived and the judge asked appropriate questions (why she felt embarrassed; “So I assume you studied long ago to take the *CJP Supp. 24 test; right?”), he quickly learned that she had been naturalized as a citizen when she was two years old, and then was sent to Mexico where she stayed until she grew up.
Judge Clarke denied that he accused Juror No. 4688 of lying, and instead describes his remarks as expressing skepticism. But, the transcript reveals that he repeatedly accused the juror of trying to “fool” him and told her if she did not “start” being honest with him, she would be there a lot longer and might even have to come back the next day. This is the equivalent of accusing her of lying.
Judge Clarke cites People v. Venegas (1970) 10 Cal.App.3d 814 [89 Cal.Rptr. 103] for the proposition that it is proper for a judge who believes that someone has testified falsely to say so, rather than remain silent. Venegas cannot reasonably be interpreted as condoning the judge’s remarks to a juror in this case. In Venegas, the judge admonished a witness who was hostile, argumentative and evasive of the possible penalty for perjury, and told the witness, “If you are telling the truth, there is no problem.” (Id. at p. 825.) The appellate court noted that the judge did not at any time directly accuse the witness of lying, and stated, “The mere comment by the court in a court trial of its disbelief of a witness’ testimony in a temperate manner is not error.” (Ibid.) In this case, Judge Clarke directly accused Juror No. 4688 of trying to “fool” him and his comments were not made in a temperate manner. In People v. Steinfeld (1940) 38 Cal.App.2d 280, 282 [101 P.2d 89], the court stated: “It is not customary in American courts which follow approved principles of decorum to address witnesses in the curt manner in which defendant was addressed. Neither is it customary to interrupt the testimony of witnesses to accuse them of lying.”
Significantly, Judge Clarke received an advisory letter from the commission less than six months before the conduct in this matter for conduct that included calling a criminal defendant whom the judge believed had misrepresented the amount of funds in his propria persona account, “a ditherer, a dissembler, a poser and a fraud.”
Judge Clarke has again violated his duty under the canons to be patient, dignified and courteous to those who appear before him by accusing Juror No. 4688 in open court of dishonesty in an intemperate and disparaging manner.
*CJP Supp. 25 D. Count Three
1. Factual Findings
During the afternoon court session on May 6, Judge Clarke considered the hardship request of Juror No. 7132, who had written on her hardship form that she had $25 in her checking account. The following occurred:
“[THE COURT:] Next up, 7132. That’s 137 on the random list. [¶] Hello.
“[JUROR NO. 7132]: Hello.
“[THE COURT]: You actually told me how much you have in your checking account.
“[JUROR NO. 7132]: I can show you too.
“[THE COURT]: No. No. It’s an impressive and convincing figure.
“[JUROR NO. 7132]: Thank you for not sharing it.
“[THE COURT]: Well, every one of these lawyers spent more than that on lunch today.
“[JUROR NO. 7132]: Great.
“[THE COURT]: Probably. [¶] But, yes, I know some wait staff make a lot of money. Sounds like you’re not in that category yet, so I’m going to excuse you. Thank you.
“[JUROR NO. 7132]: Thank you.
“[THE COURT]: That’s 137, 7132. She has $25 in her checking account. I know you all eat for less than $25. Sometimes we don’t. That’s cutting it close.”
Juror No. 7132 had exited the courtroom when the judge revealed the amount in her checking account.
Juror No. 7132 testified that the judge’s remark comparing the amount in her account with what the attorneys spent for lunch was “embarrassing and condescending.” When she responded, “Great,” to the judge’s comment, she did so sarcastically. When Juror No. 7132 left court she called a friend because it was embarrassing and she thought it was an unusual story and *CJP Supp. 26 worth sharing. She was crying when she spoke with her friend. The juror told a commission investigating attorney that this conversation took place as she was walking to lunch. The interaction with the judge occurred in the afternoon session. In her testimony, she acknowledged that she could have been mistaken as to when she called the friend.
There were mixed reactions to the remarks from actual observers in the courtroom (a juror and defense counsel considered the comments demeaning; another defense attorney and the deputy district attorney did not find the comments to be offensive).
Judge Clarke denied he had any intent to demean or embarrass Juror No. 7132. He testified that he intended his exchange with the juror as light-hearted banter meant humorously. He said the juror acted like she was doing comedy and was kidding and joking. He also stated he disclosed the amount in her account because he realized that it was impolite to make a joke comparing the amount in her account with how much money the attorneys spent on lunch when the attorneys did not know the figure.
Yet another explanation offered by the judge was that he revealed the specific amount in the juror’s checking account to provide the attorneys with a factual basis for the hardship excuse. However, the judge acknowledged he excused other jurors for financial hardship without providing the attorneys with a factual basis. He also admitted he did not reveal the amount in Juror No. 5868’s (count four) account to provide the factual basis for his hardship excuse.
In addition, Judge Clarke had the agreement of the attorneys to handle hardship requests without their input and without providing them with the hardship forms, although they were free to request the forms. None of the attorneys challenged the judge’s decision to excuse Juror No. 7132, or asked the factual basis for dismissing the juror. At his appearance before the commission, Judge Clarke stated he did not think the attorneys would have challenged the financial hardship of Juror No. 7132, or would have cared if he did not disclose the amount in her account.
We find that the judge’s remark was not intended to provide a factual basis for the hardship excuse.
2. Conclusions of Law
The masters concluded that although the judge bordered on acting undignified, his conduct did not violate the canons or constitute misconduct. We reach a different conclusion, and find that Judge Clarke violated canon 3B(4) *CJP Supp. 27 and engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
Even if Judge Clarke thought he was engaging in humorous banter,[8] joking about a juror’s limited financial resources and revealing personal financial information in open court, particularly when the juror expressed that she did not want that information to be disclosed, is manifestly discourteous and undignified. Judge Rothman states: “A sense of humor is essential to judicial demeanor, and the modest injection of humor at the appropriate time can reduce tension, and can be a tool for restoring control in court. The problem, however, is that much of what seems funny in court relate [«'c] to the conduct or demeanor of those standing before the court, creating the temptation to get a laugh at their expense. The temptation is especially great given how easy it is for a judge to get a laugh from the adoring audience of those seeking the favor of the judge. [Fn. omitted.] In addition, one must always remember there may be people in the courtroom under very serious or grave circumstances who may not appreciate jocular and humorous exchanges between the judge and counsel. A judge needs to always keep in mind that breaks to joke around and have a few laughs may not be in the service of the goals and objectives of a judicial proceeding.” (Rothman, Cal. Judicial Conduct Handbook, supra, § 3.42, p. 140.)
The commission has recognized that humor may be inappropriate and may violate the canons, particularly when at the expense of another. In Public Censure of Judge DeAnn M. Salcido (2010), the commission stated, ‘“Judicial humor should never be used in a courtroom ... in a manner that diminishes the dignity of the judicial process.” The commission has also stated, ”[H]umor at the expense of another, or humor intended or likely to demean or belittle another is unacceptable.” (Public Reproval of Judge Gary T Friedman (1993); see also Public Admonishment of Judge Robert C. Coates (2000).)
When members of the public give up their time for jury service, they do not expect to have their private financial information disclosed in open court or to be the brunt of jokes about their limited financial resources. Moreover, here, Judge Clarke revealed the amount in the juror’s account even after she had thanked him for not doing so. Such conduct objectively undermines public respect for the judiciary. Therefore, we conclude that the judge’s comments and gratuitous disclosure of the amount in the juror’s checking account constitutes prejudicial misconduct.
*CJP Supp. 28 E. Count Four
1. Findings of Fact
Juror No. 5868 wrote on his hardship form that he had $33 in his checking account. In addressing the hardship claim, Judge Clarke said to the juror, “[You have a] little bit more than the other gal. [Thirty-three] bucks,” and “You are putting her [Juror No. 7132] in the shade with that big account.” The judge excused the juror and said, “Good luck on getting paid and being able to bring that number up a little bit better.”
Judge Clarke testified he was making a lighthearted joke. Juror No. 5868 testified he did not feel humiliated or embarrassed by the judge’s comments.
2. Conclusions of Law
We conclude the judge’s comments to Juror No. 5868 about his limited financial resources and the judge’s gratuitous disclosure of the amount in the juror’s account was discourteous and undignified and violated canon 3B(4). For the reasons discussed with respect to the conduct in count three, the majority of the commission also concluded that the judge’s conduct undermined public esteem for the judiciary and thus constituted prejudicial misconduct. (Four commission members considered the conduct on this count to be improper action.)
Whether the judge’s comments are considered demeaning, undignified and discourteous in violation of canon 3B(4) and undermine public esteem for the judiciary is judged by an objective standard. Otherwise, the subjective perception of complainants would determine whether the judge engaged in misconduct and lead to inconsistent commission decisions. The fact that Juror No. 5868 was not embarrassed while similar comments brought Juror No. 7132 to tears illustrates that people have different sensitivities. The commission must view the conduct from the perspective of an objective person aware of the circumstances. In the commission’s determination, such a person would find the judge’s gratuitous disclosure of a juror’s personal financial information and jokes about the juror’s limited financial means to be discourteous and demeaning and harmful to public esteem for the judiciary.
F. Count Five
1. Findings of Fact
On her hardship form, Juror No. 1968 indicated that during the anticipated pendency of the trial she was scheduled to shoot a film entitled, “The Big *CJP Supp. 29 Balloon.” In questioning the juror about her role in the film, the judge stated he would not disclose the name of the film. After excusing the juror and after she left the courtroom, the judge said, ‘“It sounds like a nice PG project, by the way, for those of you letting your minds run a little bit.”
Juror No. 1968 did not hear the ‘“PG” comment, but heard laughter after she left the courtroom.
Judge Clarke testified that after he told the juror in open court that he would not disclose the name of the film, he became concerned that the attorneys and other jurors could be speculating that it was a gang-related movie. He testified that he wanted them to know that it was a wholesome film title. One of the defense attorneys recalled the juror being attractive and that there was whispering among the defense attorneys about whether it was a pornographic film. Judge Clarke testified that he did not hear this conversation.
The masters found implausible the judge’s explanation that he was attempting to curb speculation that the movie might be about gangs and violence (rather than a sexually explicit film). Judge Clarke objects to this factual finding. We find that the masters’ finding is supported by clear and convincing evidence.
The judge’s assertion that he thought the jurors might be speculating that the movie was about gangs or violence makes no sense and finds no support in the record. There is no conceivable reason the jurors would make this assumption. There was nothing said about the movie that would suggest that the juror was in a movie about gangs or violence. And the judge acknowledged that there was nothing about the juror’s appearance or demeanor that would have created such curiosity.
We find that the judge made the remark in an effort to be humorous.
2. Conclusions of Law
The masters concluded that the ‘“PG” remark did not violate the canons or constitute misconduct. We agree.
The use of humor in the courtroom does not in itself constitute misconduct. (Inquiry Concerning Harris (2005) 49 Cal.4th CJP Supp. 61, 71.) The question is whether the humor was discourteous, undignified or demeaning. Unlike the comments to the jurors about their limited finances, this remark was not making fun of a person’s personal circumstances. As the examiner points out, the ‘“PG” comment could be interpreted as suggesting *CJP Supp. 30 that others in the courtroom were thinking that the juror was in a sexually explicit film. However, the judge’s comment was not accusing the juror of being in a sexually explicit film, but dispelled any such thoughts that the judge could have created when he said he would not disclose the name of the film. Although the remark would have been better left unsaid, we agree with the masters that any lack of dignity with respect to this comment is de minimis. As such, we conclude that the conduct as proven in count five did not clearly and convincingly constitute a violation of the canons or misconduct.
IV.
DISCIPLINE
In determining the appropriate discipline, we consider several factors, including the nature and number of incidents of misconduct, whether the judge has prior discipline, whether the judge acknowledges and appreciates the impropriety of his or her actions, the extent to which the misconduct is injurious to others, the impact of the misconduct on public esteem for the judiciary, and the judge’s reputation for administering his or her duties in a fair, impartial, and dignified fashion. (Policy Declarations of Com. on Jud. Performance, policy 7.1 [non-exclusive factors relevant to sanctions]; e.g., Inquiry Concerning Mills (2013) 57 Cal.4th CJP Supp. 1, 15.)
Judge Clarke engaged in one instance of willful misconduct, three instances of prejudicial misconduct, and one instance of improper action. The misconduct demonstrates a pattern of discourteous and undignified treatment of jurors. Public esteem for the judicial system is harmed when a judge mistreats and belittles jurors, uses humor at a juror’s expense, and retaliates against a juror for complaining about his clerk. Jury service is essential to maintaining one of the bedrocks of our judicial system: the constitutional right to trial by an impartial jury.
The judicial disciplinary process plays an important role in maintaining public trust and confidence in the judiciary and the administration of justice. (Adams, supra, 10 Cal.4th at p. 912.) For many members of the public, jury service is their only opportunity to witness the justice system at work. How a judge treats jurors can leave a lasting impression, not only of that particular judge, but of the entire judicial institution. Judge Clarke presented evidence concerning the reluctance of many citizens to serve as jurors in Los Angeles County. In the commission’s view, jurors are more likely to be willing to serve when treated with dignity and respect. Jurors are asked to take time out of their lives as a public service, often at a financial loss. They deserve to be treated with patience, dignity and courtesy.
*CJP Supp. 31 In addition to the impact on the esteem of the judiciary and the judicial system, the commission considers the extent to which the misconduct has been injurious to other persons. (Policy Declarations of Com. on Jud. Performance, policy 7.l(l)(f>.) In this case, the judge’s conduct brought three jurors to tears. Moreover, it appears that the judge’s conduct was intimidating to other jurors and caused general discomfort in the courtroom, as reflected by the comment of the juror following Juror No. 7122, “Hate to follow that.”
At his appearance before the commission, Judge Clarke showed little appreciation of the impact of his conduct on the jurors who were the recipients of his discourteous and demeaning comments. While acknowledging that the juror in count one was sobbing, he was dismissive of her emotions because “[i]t fit the way she behaved that day.” He admitted seeing the juror in count two crying in the presence of the interpreter, but denied that he made her cry because by the time she was recalled “she was no longer crying.” And, with respect to count three, he questioned the credibility of the juror’s testimony that she cried while telling her friend what happened in court.
The commission understands that this was a long and stressful jury selection and that evaluating hardship claims can be difficult. However, this does not excuse Judge Clarke’s disrespectful treatment of four jurors.
Judge Clarke maintains that his conduct in this case is a consequence of the unusual circumstances of the Diaz case and is not reflective of his treatment of jurors in general. He presented testimony and declarations from others who served as jurors or who were prospective jurors in his courtroom in other cases and who praised his treatment of jurors (a friend, an attorney, and two fellow judges). However, the examiner presented the testimony of an attorney, David Freedman, who had a poor experience when he was a prospective juror in the judge’s courtroom in a different case and who contacted the commission office after reading about the charges brought against the judge. When Freedman expressed reservation about his ability to be fair given the defendant’s appearance and tattoos, the judge lectured him at some length about the concept of a fair trial. Freedman thought the judge’s comments were insulting and offensive.[9]
Another indication that the poor demeanor exhibited by Judge Clarke in this case is not simply a result of the stress associated with selecting a jury for a multidefendant murder trial is the judge’s prior discipline for similar misconduct. As previously noted, in December 2013, less than six months *CJP Supp. 32 before the conduct in this matter, Judge Clarke received an advisory letter for two incidents of misconduct involving a propria persona criminal defendant. The first incident involved the defendant’s request for additional ancillary funds for “phone time.” After forming the opinion the defendant had misrepresented that he did not have funds, the judge called the defendant “a ditherer, a dissembler, a poser and a fraud.” The second incident involved a statement of disqualification filed by the same defendant, which was based in part on the aforementioned comments. The judge struck the disqualification motion as having no merit on its face, rather than having it heard by another judge. The first incident is similar to the judge’s conduct in accusing the juror in count two of trying to fool him into thinking she did not speak English. Prior discipline, particularly for similar misconduct, is a significant factor in the commission’s determination of the appropriate level of discipline. (Policy Declarations of Com. on Jud. Performance, policy 7.1(2)(e).) As such, this factor weighs in favor of public discipline.
Whether a judge has shown an appreciation of the impropriety of his or her acts is another factor relevant to sanctions. (Policy Declarations of Com. on Jud. Performance, policy 7.1(2)(a).) A judge’s failure to appreciate or admit the impropriety of his or her acts indicates a lack of capacity to reform. (Inquiry Concerning Platt (2002) 48 Cal.4th CJP Supp. 227, 248.) Judge Clarke acknowledged he displayed inappropriate judicial demeanor in his comments to Juror No. 7122, but denied any impropriety in ordering her to wait in the hall. The judge acknowledged that it would have been better had he not stated in open court the amount in the checking accounts of Jurors No. 7132 and No. 5868, but denied that doing so constituted misconduct. He denied accusing Juror No. 4688 of lying, and instead described his remarks as appropriately expressing skepticism. Thus, Judge Clarke has shown a very limited appreciation of the impropriety of his conduct.
In determining the appropriate level of discipline, we have also taken into consideration the testimony and declarations from other judges and lawyers attesting to Judge Clarke’s positive qualities as a judge. He is described as intelligent, professional, fair, even-tempered, and hardworking. While the judge’s positive reputation for administering justice is a factor that may mitigate the level of discipline (Policy Declarations of Com. on Jud. Performance, policy 7.1(2)(g)), in this case, it is outweighed by the consideration of the factors discussed above, particularly the nature and number of incidents of misconduct and the judge’s prior discipline.
As recognized by the masters, Judge Clarke’s conduct toward the juror in count one is similar to that of other judges who have been publicly admonished based on discourteous and denigrating comments, use of humor at the expense of litigants and embroilment. (Public Admonishment of *CJP Supp. 33 Commissioner Alan H. Friedenthal (2012); Public Admonishment of Judge Paul M. Bryant, Jr. (2008); Public Admonishment of Judge James M. Petrucelli (2007).) The comparison to prior public admonishments for this type of misconduct is even stronger given the additional misconduct we have found in counts two through four. (See also Public Admonishment of Judge Joseph E. Bergeron (2016); Public Admonishment of Judge Daniel J. Healy (2014).)
Weighing all of the foregoing factors leads us to the conclusion that a public admonishment is the appropriate discipline in order to protect the public, enforce rigorous standards of judicial conduct, and maintain public confidence in the integrity and impartiality of the judiciary.
Finally, we address the position of the amicus curiae brief with respect to discipline. The Alliance asserts that the commission should not impose discipline on Judge Clarke and instead should allow the judge’s supervisor to handle the matter “locally.” According to the Alliance, a “few words from a supervising judge would have handled this matter adequately without involving the disciplinary machinery of the commission.”[10] This argument reflects a misunderstanding of the role of the commission. Under the California Constitution, the commission is responsible for investigating complaints of judicial misconduct and disciplining judges. (Cal. Const., art. VI, § 18.) By referring a complaint of judicial misconduct to the local court, the commission would effectively be relinquishing its responsibility under the Constitution. In changing the composition of the commission from a majority of judge members to a majority of public members, the voters declared that complaints of judicial misconduct should be reviewed and decided by a commission that does not consist of all judges. The Alliance’s suggestion that Judge Clarke’s misconduct be handled by local judges, rather than the commission, runs contrary to the manifest intent of the voters, and the responsibility entrusted to the commission by our state Constitution.
ORDER
Pursuant to the provisions of article VI, section 18 of the California Constitution, we hereby impose this public admonishment.
Commission members Anthony P. Capozzi, Esq.; Hon. Ignazio J. Ruvolo; Ms. Mary Lou Aranguren; Ms. Sarah Kruer Jager; Ms. Pattyl A. Rasparían; Hon. Thomas M. Maddock; Dr. Michael A. Moodian; Nanci E. Nishimura, Esq.; Mr. Richard Simpson; Mr. Adam N. Torres and Hon. Erica R. Yew *CJP Supp. 34 voted in favor of imposition of a public admonishment. Commission members Anthony P. Capozzi, Esq.; Hon. Ignazio J. Ruvolo; Ms. Mary Lou Aranguren; Ms. Sarah Kruer Jager; Hon. Thomas M. Maddock; Nanci E. Nishimura, Esq. and Mr. Adam N. Torres voted in favor of all the findings and conclusions herein. Commission members Ms. Pattyl A. Rasparían, Dr. Michael A. Moodian, Mr. Richard Simpson and Hon. Erica R. Yew concur in all the findings and conclusions herein, except for the legal conclusion that the judge’s conduct in count four constitutes prejudicial misconduct, and would have voted in favor of concluding that the conduct in count four constitutes improper action
Review denied March 15, 2017.

 Hereafter, prospective jurors are referred to as jurors.

 Hereafter, all references to a rule are to the Rules of the Commission on Judicial Performance.

 The Alliance states that it is an association of approximately 500 judicial officers. The Alliance website states, “The Alliance of California Judges was formed on September 11, 2009, in response to the unprecedented financial crisis now facing our judicial branch. We are a new organization of judges in the State who will be a meaningful voice to independently advocate and communicate on behalf of judges with the public, media, and Executive and Legislative branches.”

 We note that ruling on hardship claims is an adjudicative responsibility, not an administrative duty.

 The special masters found that the juror had changed and initialed the box for non-English speaking, even though she had been deemed qualified. Judge Clarke objects to this factual finding, and asks the commission to find that she changed her answer from non-English to English, not the other way around. Juror No. 4688 did not testify at the hearing. We find that there is not clear and convincing evidence to determine which box the juror filled in first or to determine the juror’s intent in making the change.

 The examiner objects to the masters’ statement that “[b]oth the deputy district attorney and one of the defense attorneys thought she was dissimulating about her English proficiency.” The transcript reflects that the deputy district attorney testified that he did not think Judge Clarke believed Juror No. 4688, not that he (the deputy district attorney) did not believe her.

 The examiner asserts that Judge Clarke also violated canon 3B(4) by failing to give Juror No. 4688 any indication of how long she would have to wait in the hall. When Judge Clarke first ordered the juror to wait in the hall, he did not know how long it would take to get her juror affidavit. The record does not reflect when the judge received the juror affidavit. Sometime in the afternoon, by his estimate at approximately 2:55 p.m., when his clerk inquired about Juror No. 4688, the judge responded, “She can come at the end of the day when we’ve finished.” Although, at that point, it would have been preferable to inform the juror that she would have to wait until approximately 4:00 p.m., based on this record, we conclude that there is not clear and convincing evidence that failure to do so violated canon 3B(4).

 We note that Judge Clarke could not have been engaging in banter with the juror when he revealed the amount in her account because she had already left the courtroom.

 Judge Clarke contends that the commission should not consider Freedman’s testimony because the conduct was not charged. However, the masters correctly admitted this evidence to rebut the judge’s evidence that he customarily treats jurors with respect.

 There is no evidence or suggestion that this matter was ever referred to a supervising judge, or that a supervising judge took any action.